## STATE OF CONNECTICUT *v.* ADRIAN PEELER
### (SC 16571)

Sullivan, C. J., and Norcott, Palmer, Vertefeuille and Zarella, Js.

Argued September 22, 2003—officially released February 24, 2004

*Felix Esposito*, for the appellant (defendant).

*Susann E. Gill*, senior assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Joseph T. Corradino*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. A jury found the defendant, Adrian Peeler, guilty of conspiracy to commit murder in violation of General Statutes §§ 53a-54a[1] and 53a-48.[2] The trial court rendered judgment in accordance with the jury verdict,[3] and the defendant appealed,[4] claiming that the trial court improperly had: (1) rejected his claim that the state, during jury selection, exercised a peremptory challenge in a racially discriminatory manner; (2) per-

---

[1] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] General Statutes § 53a-48 provides in relevant part: "(a) A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy. . . ."

[3] The trial court sentenced the defendant to a term of twenty years imprisonment, to run consecutive to a previously imposed federal sentence of thirty-five years imprisonment for the commission of certain federal narcotics offenses.

[4] The defendant initially appealed to the Appellate Court. Because the defendant should have taken his appeal directly to this court; see General Statutes § 51-199 (b) (3); his appeal was transferred to this court pursuant to Practice Book § 65-4.

mitted the state to introduce certain hearsay statements under the coconspirator exception to the hearsay rule; and (3) permitted the state to introduce certain evidence relating to motive. The defendant also claims that certain remarks made by the state's attorney during closing arguments deprived him of a fair trial. We reject these claims and, accordingly, affirm the judgment of the trial court.

The record reveals the following facts. In the 1990s, the defendant and his brother, Russell Peeler (Russell), ran a large-scale drug trafficking operation in the city of Bridgeport. The defendant and Russell divided the profits derived from the operation, which were estimated to be as much as $38,000 per week.

Sometime in 1997, Russell and a former drug trafficking partner, Rudolph Snead, Jr., had a dispute, apparently over drug money. As a result of this dispute, Russell attempted to kill Snead on September 2, 1997. Specifically, on that date, Russell was riding in a car with Ryan Peeler, Corey King and Shawn Kennedy when Russell noticed Snead's car in the parking lot of a barbershop located in Bridgeport. Snead subsequently left the barbershop and drove to a gas station. Two seven year old boys, one of whom was Leroy Brown, Jr., were passengers in Snead's car.

After Snead exited the gas station, Russell followed Snead to the Lindley Street entrance ramp to Route 25 in Bridgeport. Snead proceeded up the ramp but gradually slowed down and pulled off to the side of the road. The car in which Russell was riding pulled alongside Snead's car. Russell, who was armed with a .40 caliber, semiautomatic handgun and seated in the right front passenger seat, fired several shots at Snead.[5] Although Snead had been injured by the shots, he was able to drive himself to St. Vincent's Medical Center in

---

[5] We hereinafter refer to this incident as the Lindley Street shooting.

Bridgeport where he received treatment for his gun-shot wounds.

Shortly thereafter, Officer Robert Shapiro of the Bridgeport police department interviewed Snead and his two young passengers. Shapiro's investigative report included the names of all three interviewees. On the basis of Snead's identification of Russell as the person who had shot him, Russell was arrested and charged with attempted murder.

Russell posted bond, however, and was released from custody. While free on bond, Russell shot and killed Snead in the same barbershop that Snead had patronized immediately prior to the Lindley Street shooting. After ballistics tests performed on shell casings retrieved from the murder scene and the scene of the Lindley Street shooting revealed that they had been fired from the same gun, Russell was arrested and charged with the murder of Snead.

Russell again secured his release by posting bond. As a condition of his release, Russell was required to be in his house on Chopsey Hill Road in Bridgeport by 9 p.m. each evening. He also was required to wear an electronic ankle bracelet so that his compliance with the court imposed curfew could be monitored.

In January, 1998, during the course of pretrial discovery in the criminal case involving the Lindley Street shooting, the state provided Russell with a police report identifying Brown as one of the two passengers in Snead's car when the Lindley Street shooting had occurred. Russell did not learn, however, until December 23, 1998, that Brown and his mother, Karen Clarke, had given the police sworn, written statements about the Lindley Street shooting. In addition, after Russell was arrested for Snead's murder, the state provided Russell with copies of certain ballistics reports connecting the shell casings found at the scene of the Lindley

Street shooting with the shell casings found at the scene of Snead's murder.

During the fall of 1998, Russell frequently speculated about the identity of the state's witnesses. Upon learning that Brown's testimony linked him to the Lindley Street shooting and that the ballistics evidence connected that shooting with the murder of Snead, Russell began to speak about killing Brown and Clarke. On one such occasion, Russell and the defendant had a heated discussion in which Russell repeatedly implored the defendant to kill Brown and Clarke. The defendant declined to do so, however.

At this time, Russell and his drug trafficking associates were using a house located at 200 Earl Avenue in Bridgeport to process crack cocaine. The residents of that house, including Josephine Lee, were crack cocaine users who obtained their drugs from Russell and the defendant's drug operation. Brown and Clarke lived across the street, at 207 Earl Avenue.

Lee testified that, on January 6, 1999, Russell and King were at her house, observing Clarke's house from a window in Lee's dining room. Lee further testified that the defendant and Gary Garner, one of Russell's associates, came by her house that day. King eventually left Lee's house and, thereafter, Lee observed Russell and the defendant having a discussion in her living room.

Russell and the defendant then entered Lee's kitchen and prepared some crack cocaine. At that time, Russell offered Lee "a couple hundred" dollars if she would kill Clarke. Lee, who testified that she never had handled a gun, declined to do so, however. Russell thereupon asked the defendant if he would kill Clarke. According to Lee, the defendant stated that he would "take care of it."

Russell then asked Lee to keep an eye on Clarke's house and to contact him when Clarke and Brown arrived home. Lee agreed to do so, and Russell wrote down his beeper number for Lee so that she could reach him when Clarke and Brown returned home. Russell gave Lee some crack cocaine, apparently in return for her willingness to act as a lookout for him.

Lee testified further that, the next day, in the late afternoon, she was at home "getting high" when she observed Clarke pull into her driveway. Both Clarke and Brown exited the car and entered Clarke's house. Lee then called Russell's beeper number. Upon receiving the beeper message, Russell called Lee back. Lee told Russell that "the little boy and lady [were] home." A few minutes later, Lee entered her living room and saw the defendant standing there. The defendant, who was dressed in black and had a gun in his hand, greeted Lee and then left Lee's house through the front door. Lee followed him.

The defendant crossed the street and walked toward Clarke's house. The defendant stopped, however, to speak to Garner, who was the lone occupant of a car that was parked in front of Clarke's house. Lee testified that she heard the defendant tell Garner that "he was going in." According to Lee, Garner then warned her that if she "said anything," she and the "whole house" were "going to get it, too."[6]

The defendant and Lee walked up to Clarke's front door. Lee rang the doorbell while the defendant hid behind her. Lee heard Clarke, from inside the house, ask, "Who is it?" Lee identified herself as "[t]he girl across the street." Clarke started to open the door when the defendant pushed past Lee and forced the door open.

---

[6] When Garner mentioned Lee's "whole house," he apparently was referring to all of the persons who lived in Lee's house.

Lee testified that she followed the defendant into Clarke's house where she observed him chase Brown and Clarke up a flight of stairs. While Brown was "hollering out for his mommy," the defendant pursued Clarke into an upstairs bedroom. According to Lee, she heard the defendant say something about Brown being a witness and then heard a gunshot from the bedroom. Lee testified that, immediately thereafter, the defendant emerged from that room and shot Brown in the head. The defendant then ran out of the house. Lee initially froze, but, thereafter, she, too, fled Clarke's house. By the time she had done so, however, both the defendant and the car in which Garner was sitting were gone.

After the shootings, the defendant drove to a Comfort Inn motel in Milford and checked in under a false name. He subsequently went with Kennedy and King to the mall in Stamford. The defendant eventually returned to the Comfort Inn where he remained until the next morning. The next day, the defendant purchased a round trip plane ticket to North Carolina under another false name. The defendant was to leave for North Carolina on January 10, 1999, and was to return to Connecticut on January 16, 1999. The defendant thereafter changed his departure date to January 17, 1999, and his return date to January 23, 1999. The defendant never used the ticket, however, and did not exchange it or seek a refund.

On January 14, 1999, Russell was arrested for the murders of Brown and Clarke. Soon thereafter, the Bridgeport Post ran a story about Russell's arrest that included a photograph of the defendant. That same day, at the defendant's request, Kennedy drove the defendant to New York City where the defendant boarded a train headed for North Carolina. On January 21, 1999, members of a Federal Bureau of Investigation (FBI) fugitive task force apprehended the defendant in North Carolina in connection with the murders of Brown and

Clarke. The defendant subsequently was charged with two counts of capital felony in violation of General Statutes (Rev. to 1997) § 53a-54b (8) and (9),[7] one count of murder and one count of conspiracy to commit murder.[8] After a jury trial, the defendant was convicted of conspiracy to commit murder and acquitted on the other charges. Additional facts will be set forth as necessary.

I

The defendant first claims that the trial court improperly overruled his objection to the state's use of a peremptory challenge against venireperson A.F.,[9] an African-American female. Specifically, the defendant contends that his equal protection rights were violated because the state's exercise of that challenge was the product of impermissible racial discrimination. We disagree.

Before addressing the merits of the defendant's claim, we set forth the well established legal principles that govern our review. "In *Batson* [v. *Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986)] the United States Supreme Court recognized that a claim of purposeful racial discrimination on the part of the prosecu-

---

[7] General Statutes (Rev. to 1997) § 53a-54b provides in relevant part: "A person is guilty of a capital felony who is convicted of . . . (8) murder of two or more persons at the same time or in the course of a single transaction; or (9) murder of a person under sixteen years of age."

Subsections (8) and (9) of General Statutes (Rev. to 1997) § 53a-54b currently are codified at subsections (7) and (8) of General Statutes § 53a-54b as a result of the legislature's redesignation of certain subsections of § 53a-54b in 2001. See Public Acts 2001, No. 01-151, § 3.

[8] The defendant also was charged with one count of conspiracy to participate in an enterprise operating through a pattern of racketeering activity in violation of General Statutes §§ 53-395 and 53a-48. The trial court subsequently granted the defendant's motion to sever this count from the other counts. See *State* v. *Peeler*, Superior Court, judicial district of Waterbury, Docket No. CR99-148397 (October 12, 2000).

[9] We use the initials of the venireperson to protect her legitimate privacy interests. E.g., *State* v. *Reynolds*, 264 Conn. 1, 116 n.109, 836 A.2d 224 (2003).

tion in selecting a jury raises constitutional questions of the utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole. . . . The court concluded that [a]lthough a prosecutor ordinarily is entitled to exercise permitted peremptory challenges for any reason at all, as long as that reason is related to his [or her] view concerning the outcome of the case to be tried . . . the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race . . . .

"Under Connecticut law, [o]nce a [party] asserts a *Batson* claim, the [opposing party] must advance a neutral explanation for the venireperson's removal. . . . The [party asserting the *Batson* claim] is then afforded the opportunity to demonstrate that the [opposing party's] articulated reasons are insufficient or pretextual. . . . [T]he trial court then [has] the duty to determine if the [party asserting the *Batson* claim] has established purposeful discrimination. . . . The [party asserting the *Batson* claim] carries the ultimate burden of persuading the trial court, by a preponderance of the evidence, that the jury selection process in his or her particular case was tainted by purposeful discrimination. . . .

"We have identified several specific factors that may indicate that [a party's removal] of a venireperson through a peremptory challenge was . . . motivated [by race or gender]. These include, but are not limited to: (1) [t]he reasons given for the challenge were not related to the trial of the case . . . (2) the [party exercising the peremptory strike] failed to question the challenged juror or only questioned him or her in a perfunctory manner . . . (3) prospective jurors of one race [or gender] were asked a question to elicit a particular response that was not asked of the other jurors . . . (4) persons with the same or similar characteris-

tics but not the same race [or gender] as the challenged juror were not struck . . . (5) the [party exercising the peremptory strike] advanced an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically . . . and (6) the [party exercising the peremptory strike] used a disproportionate number of peremptory challenges to exclude members of one race [or gender]. . . .

"In assessing the reasons proffered in support of the use of a peremptory challenge . . . [a]n explanation . . . need not . . . be pigeon-holed as wholly acceptable or wholly unacceptable . . . and even where the acceptability of a particular explanation is doubtful, the inquiry is not at an end. In deciding the ultimate issue of discriminatory intent, the judicial officer is entitled to assess each explanation in light of all the other evidence relevant to prosecutorial intent. The officer may think a dubious explanation undermines the bona fides of other explanations or may think that the sound explanations dispel the doubt raised by a questionable one. As with most inquiries into state of mind, the ultimate determination depends on an aggregate assessment of all the circumstances. . . .

"Finally, the trial court's decision on the question of discriminatory intent represents a finding of fact that will necessarily turn on the court's evaluation of the demeanor and credibility of the attorney of the party exercising the peremptory challenge. . . . Accordingly, a trial court's determination that there has or has not been intentional discrimination is afforded great deference and will not be disturbed unless it is clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation

marks omitted.) *State* v. *Mukhtaar*, 253 Conn. 280, 283–86, 750 A.2d 1059 (2000). With these principles in mind, we now turn to the factual underpinnings of the defendant's claim.

After both parties had questioned A.F., the state's attorney exercised a peremptory challenge to strike her from the panel. The defendant objected, claiming that the state's exercise of a peremptory challenge against A.F. was predicated on the fact that she is African-American. The state's attorney sought to refute the defendant's claim by explaining that the primary reason for striking A.F. was that she had a son who was approximately the same age as the defendant and who had served one year in prison for drug and weapons offenses. According to the state's attorney, those offenses involved conduct that bore similarities to conduct in which the defendant engaged and regarding which the state intended to introduce evidence. The state's attorney further indicated that he also had considered the fact that A.F. herself previously had had a brush with the law.[10] Finally, the state's attorney noted that he expected the defendant to introduce, during the penalty phase of the case,[11] mitigating evidence relating to the death of the defendant's mother, a former police officer who was approximately the same age as A.F. when she died.

The defendant claimed that the reasons that the state's attorney proffered for striking A.F. from the

---

[10] When asked whether she previously had been in a courtroom, A.F. stated, inter alia: "[M]yself, in my earlier days, I've been before the judge."

[11] As we previously indicated, the defendant was found not guilty of two counts of capital felony. If the defendant had been found guilty of the crime of capital felony, however, the state indicated that it would have sought the death penalty. In such circumstances, the same panel of jurors that was responsible for deciding the guilt phase of the trial would have determined the defendant's sentence during the penalty phase, a fact that the parties necessarily were permitted to consider in formulating their questions to prospective jurors and in connection with the exercise of peremptory challenges.

panel were unsupported by the record and merely a pretext for racial discrimination. In support of his claim, the defendant referred to A.F.'s assertion that she held her son, and not the state, responsible for her son's legal difficulties. The defendant also maintained that it was improper for the state's attorney to exercise a peremptory challenge on the basis of evidence that the defendant *might* adduce at some stage of the proceedings. In addition, the defendant maintained that if A.F. were biased at all, it likely was in favor of the state in view of her employment as a correction officer. Finally, the defendant noted that the state's attorney had failed to question A.F. in more than a perfunctory manner.

The trial court concluded that the reasons offered by the state's attorney for striking A.F. were race neutral, supported by the record and not pretextual. The court thereupon overruled the defendant's objection to the state's use of a peremptory challenge to strike A.F. On appeal, the defendant renews his claim of a *Batson* violation. We agree with the state that the defendant has failed to demonstrate that the trial court's determination was clearly erroneous.

As we recently have observed, "[c]ourts consistently have upheld the use of peremptory challenges to excuse a venireperson with a close relative who has been prosecuted because of the real possibility that the venireperson may harbor resentment against prosecuting authorities generally." *State* v. *Hodge*, 248 Conn. 207, 231, 726 A.2d 531 (1999). A.F. testified that her son had been convicted of drug and weapons offenses. "Although [A.F.] stated that she would not allow [that fact] to affect her impartiality as a juror, a prosecutor is not bound to accept the venireperson's reassurances, but, rather, is entitled to rely on his or her own experience, judgment and intuition in such matters." Id.; cf. *State* v. *Smith*, 222 Conn. 1, 14–15, 608 A.2d 63 (1992) ("[a] venireperson's assessment of his [or her] own

prejudices may be untrustworthy for a variety of reasons"). Moreover, the fact that the defendant and A.F.'s son were close in age and had committed several like offenses reasonably may have caused the state's attorney to be particularly concerned that A.F. might identify with the defendant to the detriment of the state. In the absence of any other indication of racially motivated conduct by the state's attorney during the jury selection process, A.F.'s son's criminal convictions alone constituted a sufficient basis for the trial court's finding that the decision of the state's attorney to strike A.F. was not racially motivated.

Although it is true that the state did not question A.F. at length and did not press her about her ability to be impartial, the trial court reasonably concluded that the state's attorney had obtained enough information about A.F., based upon the totality of the parties' questioning of A.F., to warrant a legitimate, race neutral concern in the mind of the state's attorney regarding A.F.'s suitability as a juror. Furthermore, it is entirely proper for a prosecutor to use a peremptory challenge to strike a venireperson on the basis or his or her reasonable belief that, in light of certain evidence that the defendant is likely to produce at trial, that venireperson may be favorably disposed toward the defendant for reasons unrelated to the merits of the case. Moreover, the state's attorney was not bound to conclude that, because A.F. was a correction officer, any bias she might have likely would favor the state rather than the defendant. No such conclusion is foregone merely because a venireperson works in law enforcement, especially when, as in the present case, countervailing considerations, such as a family member with a criminal history, reasonably may be perceived to outweigh any possible bias that a venireperson otherwise might have in favor of the state.

Finally, the defendant does not contend that the state's attorney engaged in any other racially discrimi-

natory conduct during the jury selection process. Although the fact that the defendant adduced no such evidence is not dispositive of his claim, that fact supports the trial court's finding that the state's attorney's exercise of a peremptory challenge against A.F. was unrelated to A.F.'s race. We conclude, therefore, that the trial court's determination with respect to the defendant's *Batson* claim was not clearly erroneous.

## II

The defendant next claims that the trial court improperly permitted the state to introduce into evidence, under the coconspirator exception to the hearsay rule, certain inculpatory statements that Russell had made. According to the defendant, the admission of this evidence violated his right under the sixth amendment to the United States constitution to confront the witnesses against him.[12] We disagree.

The following additional facts are relevant this claim. The state called Ryan Peeler (Ryan), the defendant's cousin, as a witness in its case-in-chief. Before Ryan testified, the defendant sought to preclude the state from eliciting testimony from Ryan about certain statements that he had heard Russell make. The defendant claimed that Russell's statements were inadmissible hearsay and that their admission would violate his rights under the confrontation clause. The state claimed that Russell's statements, although hearsay, fell within the coconspirator exception to the hearsay rule. See Conn. Code Evid. § 8-3 (1) (D). The trial court agreed with the state and allowed the state's attorney to elicit Ryan's testimony regarding Russell's statements.[13]

_____

[12] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."

[13] We note that the trial court improperly instructed the jury that Ryan's testimony regarding Russell's statements could be considered only in regard to the conspiracy charge. When a hearsay statement is admissible under the coconspirator exception to the hearsay rule, its admissibility is not

Ryan then testified that, on the evening of the murders, he drove Russell's car, which he had borrowed earlier that day, to Russell's house on Chopsey Hill Road where the two men played video games. Russell told Ryan that he had been home all day and that the defendant was "doing something" for him. That same evening, Russell asked Ryan to take Russell's car when he left. The next morning, Ryan drove to Russell's house, picked him up and, at Russell's direction, took him to the Comfort Inn motel in Milford where they met the defendant. On their way to Milford, Russell told Ryan that the defendant "did something" for him and warned Ryan "not to say anything about it." Upon their arrival at the Comfort Inn, Russell went inside and Ryan waited outside. Russell eventually emerged from the motel with Garner.

A day or two after the murders, Ryan, Russell and Kennedy were together in an apartment on Lincoln Avenue in Bridgeport when Russell received a telephone call. Ryan heard Russell ask the unidentified caller, "Did you file that down?" Ryan also heard Russell use the word "river" during the telephone conversation.

On appeal, the defendant renews his claim that the trial court improperly concluded that Russell's hearsay statements were admissible under the coconspirator exception to the hearsay rule. The thrust of the defendant's contention is that the statements fall outside the exception because the evidence is insufficient to establish that they were made in furtherance of an ongoing conspiracy.[14] We disagree.

limited to proving the existence of the conspiracy or any other element of the conspiracy charge. As long as the statement at issue is relevant to the other charges, the jury may consider it for the truth of the matter asserted in connection with those other charges. See 2 C. McCormick, Evidence (5th Ed. 1999) § 259, p. 159 ("[a] conspiracy need not be formally charged for coconspirator statements to be admissible if a conspiracy in fact exists").

[14] The defendant does not contend that the evidence was insufficient to establish the existence of a conspiracy.

"It is well established that a coconspirator's [hearsay] statement, made while the conspiracy is ongoing and in furtherance of the conspiracy, is an exception to the hearsay rule and as such, does not violate the confrontation clause. . . . In order to invoke the coconspirator exception to the hearsay rule, [t]here must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made during the course and in furtherance of the conspiracy. . . . The court must make its preliminary determination[s] by a fair preponderance of the evidence . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Robertson*, 254 Conn. 739, 745, 760 A.2d 82 (2000); see also Conn. Code Evid. § 8-3 (1) (D). Moreover, "the evidence will be construed in a way most favorable to sustaining the preliminary determinations of the trial court; its conclusions will not be disturbed on appeal unless found to be clearly erroneous." *State* v. *Vessichio*, 197 Conn. 644, 656, 500 A.2d 1311 (1985), cert. denied, 475 U.S. 1122, 106 S. Ct. 1642, 90 L. Ed. 2d 187 (1986).

"[T]he in furtherance term implies . . . [that] the statements must in some way have been designed to promote or facilitate achievement of the goals of the ongoing conspiracy, as by, for example, providing reassurance to a coconspirator, seeking to induce a coconspirator's assistance, serving to foster trust and cohesiveness, or informing coconspirators as to the progress or status of the conspiracy . . . or by prompting the listener—who need not be a coconspirator—to respond in a way that promotes or facilitates the carrying out of a criminal activity . . . . Statements made by a co-conspirator to a third party who is not then a member of the conspiracy are considered to be in furtherance of the conspiracy if they are designed to induce that party either to join the conspiracy or to act in a way that will assist it in accomplishing its objectives

. . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Robertson*, supra, 254 Conn. 748–49. Of course, whether a particular statement is made in the course of and in furtherance of the conspiracy depends upon the nature of the statement and all of the relevant facts and circumstances under which it was made. See, e.g., *United States* v. *Lewis*, 759 F.2d 1316, 1340 (8th Cir.), cert. denied sub nom. *Milburn* v. *United States*, 474 U.S. 994, 106 S. Ct. 406, 88 L. Ed. 2d 357 (1985), and cert. denied sub nom. *Milburn* v. *United States*, 474 U.S. 994, 106 S. Ct. 407, 88 L. Ed. 2d 357 (1985).

Finally, "[a] conspiracy does not necessarily end with the commission of the target crime. Thus, a subsequent declaration of a conspirator may be admissible against any coconspirator . . . if the conspirators were still concerned with the concealment of their criminal conduct or their identity . . . ." (Internal quotation marks omitted.) *State* v. *Robertson*, supra, 254 Conn. 746.

The defendant first claims that Russell's two statements to Ryan about the defendant "doing something" for him were not made in furtherance of the conspiracy to murder Brown and Clarke. The defendant contends that the statements, though perhaps an acknowledgment of a conspiracy, were not intended to promote any goal of the conspiracy. See, e.g., *Tuscaloosa* v. *Harcros Chemicals, Inc.*, 158 F.3d 548, 559 (11th Cir. 1998) ("[a] statement that merely discloses the existence of a conspiracy to a non-conspirator, that merely 'spills the beans,' with no intention of recruiting the [nonconspirator] into the conspiracy does not further the conspiracy"), cert. denied, 528 U.S. 812, 120 S. Ct. 309, 145 L. Ed. 2d 42 (1999). "The law [however] does not require a conspirator to ask a third party expressly to do something to further the conspiracy in order for the statement to be admissible under the coconspirator exception to the hearsay rule. . . . Instead, [t]he standard to be applied is whether some reasonable basis

exists for concluding that the statement furthered the conspiracy." (Citations omitted; internal quotation marks omitted.) *State* v. *Robertson,* supra, 254 Conn. 750.

We conclude that the trial court properly determined that this standard was satisfied with respect to both of Russell's statements that the defendant had agreed to "do something" for him. The first such statement, which was followed by Russell's request to Ryan that Ryan take Russell's car for the night, likely was intended to provide Ryan with the reason why Russell wanted Ryan to take his car, namely, to shore up his alibi that he was home, without transportation, when the murders occurred.[15] Thus, Russell's statement was intended to induce Ryan to act in a manner that would assist Russell in establishing an alibi. The concoction of an alibi is evidence of an effort to conceal a crime; *State* v. *Booth,* 250 Conn. 611, 661, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut,* 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000); and statements relating to such efforts are admissible under the coconspirator exception to the hearsay rule. See id., 661–62.

We reach the same conclusion with respect to Russell's statement to Ryan on the day after the murders in which Russell declared that the defendant "did something" for him. Russell had reason to believe that Ryan knew about his involvement in those murders because Ryan witnessed the Lindley Street shooting, he was present when Russell asked the defendant to kill Brown and Clarke, and Russell had told Ryan the day before that the defendant was "doing something" for him. Thus, Ryan likely knew or, at the very least, suspected

---

[15] The state adduced evidence at trial that both Russell and the defendant sought to create alibis for the evening of the murders. For example, although the records pertaining to Russell's electronic ankle bracelet indicate that he generally was not at home until his 9 p.m. curfew, on the day of the murder, he did not leave his house after 3 p.m.

that Russell was involved in the murders of Brown and Clarke. Russell's statement to Ryan that the defendant "did something" for him, followed by the admonition that Ryan was "not to say anything about it," was an attempt to secure Ryan's silence and to discourage him from asking questions. See *United States* v. *Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir.) (statements to third party were made in furtherance of conspiracy when purpose of statements was to discourage third party from revealing incriminating information), cert. denied sub nom. *Lavery* v. *United States*, 493 U.S. 933, 110 S. Ct. 324, 107 L. Ed. 2d 314 (1989). Consequently, Russell's statements were made in furtherance of a conspiracy and, therefore, were admissible under the hearsay exception for statements by a coconspirator.

The defendant contends that Russell's references to the defendant's "doing something" for him did not further any conspiracy because the statements were ambiguous and subject to other interpretations. In support of this contention, the defendant relies on Ryan's testimony that he did not know what Russell was referring to when he heard the statements and, furthermore, that Ryan did nothing in response to the statements. The defendant also refers to testimony establishing that Russell was a braggart who spoke frequently of his interest in killing the victims, that Russell often lent Ryan and others his car, and that Russell did not need support for his alibi in light of the fact that his whereabouts were being monitored by his electronic ankle bracelet. We are not persuaded by the defendant's argument.

The fact that a coconspirator's statement does not *actually* further the conspiracy does not preclude the statement from being admissible under the coconspirator hearsay exception. See, e.g., *United States* v. *Reyes*, 798 F.2d 380, 384 (10th Cir. 1986); *United States* v.

*Hamilton,* 689 F.2d 1262, 1270 (6th Cir. 1982), cert. denied sub nom. *Wright* v. *United States,* 459 U.S. 1117, 103 S. Ct. 753, 74 L. Ed. 2d 971 (1983), and cert. denied sub nom. *Salisbury* v. *United States,* 459 U.S. 1117, 103 S. Ct. 754, 74 L. Ed. 2d 971 (1983). "It is enough that [the statement is] intended to promote the conspiratorial objectives." *United States* v. *Hamilton,* supra, 1270; accord *United States* v. *Reyes,* supra, 384. Similarly, the coconspirator's statement need not be perfectly clear or unambiguous. Indeed, because of the secretive nature of most conspiracies, statements that are made in furtherance of a conspiracy frequently are cryptic or guarded.[16] All that is required is a reasonable basis for concluding that the statements were made in furtherance of the conspiracy, and such a basis existed with respect to Russell's statements that the defendant was "doing something" and "did something" for him.

The defendant also claims that the trial court improperly permitted the state to elicit testimony from Ryan that he had overheard Russell, while on the telephone, ask an unknown caller, "Did you file that down?"[17] In addition, the defendant claims that the trial court improperly allowed the state to elicit testimony from Ryan that he had heard Russell say the word "river" during that same telephone conversation. In particular, the defendant contends that the statements were inadmissible under the coconspirator exception to the hearsay rule because the state never established the identity of the caller. The defendant further claims that, even if the state's failure to establish the caller's identity does not preclude the statements from being admitted under the coconspirator exception to the hearsay rule, the statements still were inadmissible inasmuch as they

---

[16] Of course, the defendant was entitled to cross-examine Ryan about the meaning of the statements, and he did so.

[17] Neither the state nor the defendant raised the issue of whether Russell's question actually constituted hearsay.

related to a conspiracy to conceal or destroy evidence that was separate and distinct from the conspiracy to murder Brown and Clarke.

With respect to the defendant's first claim, we never have held that the identity of the party to whom the statement is addressed is a prerequisite to the admissibility of a conspirator's statement under the coconspirator exception to the hearsay rule. Although the identity of that third party may be helpful in determining whether the statements were made in furtherance of a conspiracy, the third party's identity is not essential to such a determination. If, under all of the facts and circumstances, there is a reasonable basis to conclude that statements made by a coconspirator to an unidentified third party were made in furtherance of the conspiracy, those statements are otherwise admissible under the coconspirator exception to the hearsay rule. In light of the existence of evidence that Russell had solicited the murders, the proximity of the telephone call to those murders, and the fact that the murders were committed with a handgun, there was a reasonable basis for the trial court to conclude that Russell's statements related to the concealment or destruction of the murder weapon. As we have explained, efforts to conceal a crime that already has been committed generally will be deemed to be in furtherance of the conspiracy to commit that crime.

For that reason, we also reject the defendant's claim that the challenged statements were not made while the murder conspiracy was ongoing. The trial court reasonably concluded that the conspiracy was ongoing during the period shortly after the murders, when Russell was seeking to ensure the disposal of the murder weapon. Under the circumstances, therefore, it was not improper for the trial court to have allowed the state to introduce into evidence, under the coconspirator exception to the hearsay rule, Ryan's testimony about

the statements that he had overheard Russell make during the telephone call.

## III

The defendant next claims that the trial court abused its discretion in permitting the state to introduce evidence regarding the Lindley Street shooting and the subsequent murder of Snead. We disagree.

The following additional facts and procedural history are relevant to this issue. Prior to trial, the defendant filed a motion in limine seeking the exclusion of all evidence related to the Lindley Street shooting and the Snead murder (Snead evidence). The defendant asserted that the Snead evidence was not relevant to the case against the defendant because the defendant was not implicated in any act of violence against Snead. The defendant further maintained that the prejudicial effect of the Snead evidence outweighed its probative value. The trial court overruled the defendant's objections and the state introduced the Snead evidence through the testimony of a number of witnesses, including several police officers. The trial court, however, repeatedly admonished the jury, both during the trial and in its final instructions, that the Snead evidence was admissible for the limited purpose of establishing motive, intent and identity and, therefore, the jury was not to consider the evidence for any other purpose.

On appeal, the defendant renews his claims that the Snead evidence was only marginally relevant and that its prejudicial effect outweighed its probative value. We reject both of these contentions.

Well established principles govern our resolution of the defendant's claim. "Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . Evidence is relevant if it tends to make the existence or nonexistence of any other

fact more probable or less probable than it would be without such evidence. . . . To be relevant, the evidence need not exclude all other possibilities; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree." (Citations omitted; internal quotation marks omitted.) *State* v. *Cerreta*, 260 Conn. 251, 261–62, 796 A.2d 1176 (2002); see also Conn. Code Evid. § 4-1 (defining relevant evidence as "evidence having any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence"). Furthermore, our role in reviewing evidentiary rulings of the trial court is limited. "This court has consistently held that trial courts are vested with broad discretion in rulings on relevancy and every reasonable presumption must be given in favor of the court's ruling. . . . Rulings on such matters will be disturbed on appeal only upon a showing of a clear abuse of discretion." (Internal quotation marks omitted.) *State* v. *Watson*, 251 Conn. 220, 235, 740 A.2d 832 (1999).

Contrary to the defendant's claim, there can be no doubt regarding the relevance of the Snead evidence. That evidence established that: (1) Brown was an eyewitness to the Lindley Street shooting; (2) ballistics tests suggested that the same gun that was used in the Lindley Street shooting was used to kill Snead; (3) Brown and Clarke gave statements to the police implicating Russell in the Lindley Street shooting, thereby linking him to the Snead murder; and (4) Russell had asked the defendant to kill Brown and Clarke to prevent them from testifying against him. Thus, the Snead evidence was critical to explain *why* Russell had asked the defendant to kill Brown and Clarke. Indeed, the state's case would have been grievously undermined without that evidence because the jury would have been left to wonder why the state had not demonstrated any

motive for the otherwise inexplicable, execution-style murders of an innocent mother and her young child.

Although motive is not an element of any of the crimes with which the defendant had been charged, "[w]e previously have recognized the significance that proof of motive may have in a criminal case. . . . [S]uch evidence is both desirable and important. . . . It strengthens the state's case when an adequate motive can be shown. . . . Evidence tending to show the existence or nonexistence of motive often forms an important factor in the inquiry as to the guilt or innocence of the defendant. . . . This factor is to be weighed by the jury along with the other evidence in the case." (Internal quotation marks omitted.) *State* v. *Wargo*, 255 Conn. 113, 140 n.24, 763 A.2d 1 (2000). The facts of the present case graphically illustrate the importance of motive testimony: although the direct evidence establishing the defendant's involvement in the murders was predicated largely on the testimony of Lee, a readily impeachable witness, the state's case against the defendant was buttressed immeasurably by the fact that only Russell and his trusted confederates, the defendant first among them, had a reason for wanting Brown and Clarke dead. See *State* v. *Harris*, 182 Conn. 220, 224, 438 A.2d 38 (1980) (without disclosed motive, state's evidence may be so weak that guilt of accused is clouded by reasonable doubt). We can think of few cases in which motive evidence is more important.[18]

___

[18] The defendant asserts that there was no need for the jury to have heard the Snead evidence because it would have been sufficient, for purposes of demonstrating the defendant's reason for killing the victims, for the jury simply to have learned that Russell had asked the defendant to kill them. This argument is specious. The reason why *Russell* wanted the victims killed was a critically important component of the state's case against the defendant, and the state was not required to truncate its proof to accommodate the defendant's interest in avoiding the introduction of such highly relevant, albeit damaging, evidence of motive.

The defendant nevertheless contends that the Snead evidence was unduly prejudicial, and, therefore, the trial court improperly permitted the state to introduce it at trial. We disagree.

"Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . The trial court . . . must determine whether the adverse impact of the challenged evidence outweighs its probative value. . . . Finally, [t]he trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Reversal is required only whe[n] an abuse of discretion is manifest or whe[n] injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Dehaney*, 261 Conn. 336, 357–58, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003); see also Conn. Code Evid. § 4-3.

We conclude that the trial court did not abuse its discretion in concluding that the probative value of the Snead evidence outweighed its prejudicial effect. As we have explained, the evidence was highly probative of the defendant's reason for murdering the victims, and proof of that motive was especially important in view of the nature of the crimes with which the defendant was charged and the identity of the victims. Further-

more, because the Snead evidence related to prior misconduct by Russell, not the defendant, that evidence, although graphic and undoubtedly upsetting, was not likely to inflame unduly the jurors' passions against the *defendant*. In addition, the trial court's limiting instructions sufficiently mitigated any possible prejudice that could have resulted from the admission of the evidence. In the absence of a clear indication to the contrary, we presume that the jury followed the court's instructions regarding the limited admissibility of the Snead evidence.[19] See, e.g., *State* v. *Fields*, 265 Conn. 184, 207, 827 A.2d 690 (2003).

The defendant nevertheless claims that the Snead evidence was unduly prejudicial because it was graphic[20] and consumed a substantial amount of time during the trial.[21] We disagree.

The Snead evidence involved an attempted murder, a murder and the results of forensic testing that linked the two incidents. It was not unreasonable, therefore, for the state to call several witnesses to establish the facts underlying these events. Moreover, while some of the testimony may have been graphic, "any murder involves violent and upsetting circumstances . . . ."

---

[19] The defendant contends that the Snead evidence unfairly prejudiced him because the jury likely concluded that he must be a murderer like his brother. We disagree that the jury was likely to have come to that conclusion simply because Russell was the defendant's brother. Moreover, the trial court repeatedly instructed the jury that the defendant was not being tried for the Snead shootings, that the Snead evidence was not probative of the defendant's character or propensity to commit crimes and that the evidence was offered for the limited purpose of establishing motive, intent and identity. As we have explained, we have no reason to believe that the jury disregarded those instructions.

[20] In particular, the defendant refers to the testimony of a police detective who arrived at the barbershop just after Snead was shot. The detective stated that when she tried to speak to Snead, "[h]e was kind of just moaning. He seemed like he was in a lot of pain."

[21] The state called a total of eight witnesses to testify about the Lindley Street shooting and the Snead murder.

*State* v. *Herring*, 210 Conn. 78, 97, 554 A.2d 686, cert. denied, 492 U.S. 912, 109 S. Ct. 3230, 106 L. Ed. 2d 579 (1989). Because the Snead evidence properly was before the jury, the jury necessarily was exposed to some such testimony. "[A]lthough irrelevant evidence of a gruesome character is inadmissible, [t]he prosecution, with its burden of establishing guilt beyond a reasonable doubt, is not to be denied the right to prove [its case] by the most convincing evidence it is able to produce." (Internal quotation marks omitted.) *State* v. *Satchwell*, 244 Conn. 547, 575, 710 A.2d 1348 (1998). As we have explained, the Snead evidence was extremely important—indeed, it was crucial—to the state's case, and the trial court's limiting instructions minimized any possible prejudice that otherwise might have flowed from the admission of that evidence. We therefore reject the defendant's claim that the trial court abused its discretion in permitting the state to present the Snead evidence.

## IV

The defendant finally claims that certain remarks that the state's attorney had made during closing arguments deprived him of a fair trial. Specifically, the defendant maintains that the state's attorney improperly: (1) commented on the defendant's postarrest silence even though the defendant, at the time of his arrest, had been advised of his constitutional right to remain silent in accordance with *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); (2) suggested that the defendant posed a threat to Lee, the state's key witness; and (3) stated that the defendant would have killed Lee, in addition to the victims, if he had not run out of ammunition. Inasmuch as the defendant failed to object to the remarks that he now challenges on appeal, he seeks to prevail under *State*

v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[22] Although the record is adequate for our review of the defendant's claim, we nevertheless conclude that his claim must fail because the remarks of the state's attorney did not deprive him of a fair trial.[23]

We repeatedly have articulated the principles that govern our review of claims of prosecutorial impropriety during closing arguments. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. . . . [M]oreover . . . [a defendant is not entitled to prevail under *Golding*] whe[n] the claimed misconduct was not blatantly egregious and merely consisted of isolated and brief episodes that did not reveal a pattern of conduct repeated throughout the trial. . . . In determining whether the defendant was denied a fair trial [by virtue of prosecutorial misconduct] we must view the prosecutor's comments in the context of the entire trial. . . .

"As we previously have recognized, prosecutorial misconduct of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must

---

[22] In *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), we held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) Id., 239–40. "In the absence of any one of these conditions, the defendant's claim will fail." Id., 240.

[23] Thus, the defendant's claim fails under the third prong of *Golding*. See footnote 22 of this opinion.

be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . .

"Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. [The prosecutor] is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. . . . By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused [is] guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from . . . facts not in evidence, or to present matters which the jury ha[s] no right to consider." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 161–63, 836 A.2d 224 (2003).

"In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. . . . Included among those factors are the extent to which the misconduct was invited by defense conduct or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"Just as the prosecutor's remarks must be gauged in the context of the entire trial, once a series of serious improprieties has been identified we must determine whether the totality of the improprieties leads to the conclusion that the defendant was deprived of a fair trial. . . . Thus, the question in the present case is whether the sum total of [the state's attorney's alleged] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial misconduct, therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties." (Citations omitted; internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 460, 832 A.2d 626 (2003).

Applying these principles, we conclude that the majority of the challenged remarks were proper. With respect to those remarks that were improper, we nevertheless are persuaded that there is no reasonable possibility that they harmed the defendant. Consequently, we reject the defendant's claim that the state's attorney's closing arguments deprived him of a fair trial.

A

The defendant first claims that the state's attorney improperly commented, during closing arguments, on

the defendant's postarrest silence. The defendant contends that the comments of the state's attorney were improper because the defendant's silence followed his receipt of *Miranda* warnings. We conclude that the challenged remarks were not improper.

The following additional facts are necessary to our resolution of this claim. On January 21, 1999, FBI agents arrested the defendant in North Carolina. On January 22, 1999, two police detectives from Connecticut interviewed the defendant while he was incarcerated. They commenced their interview of the defendant by advising him of his *Miranda* rights, including his right to remain silent. After answering some questions posed by the detectives, the defendant invoked his right to remain silent. The jury did not hear testimony concerning the defendant's meeting with the two detectives.

Several days later, FBI Special Agent Mark Rozzi, one of the arresting officers, was informed that the defendant wished to speak with him. When Rozzi arrived at the jail where the defendant was being held, the defendant expressly waived his *Miranda* rights. Rozzi then asked the defendant what he wanted to say. The defendant began the conversation by mentioning a cellular telephone that he had possessed from early December until the date of his arrest. Rozzi asked the defendant why he wanted to discuss his cellular telephone, and the defendant responded that he wanted to clear his name regarding the murders of a young boy and his mother.[24] In particular, the defendant indicated that he wanted to explain his whereabouts at the time

---

[24] Rozzi was not then, and never has been, involved in the investigation of the murders of Brown and Clarke. Moreover, unbeknownst to Rozzi, records for the defendant's cellular telephone revealed that there were both incoming and outgoing calls at or around the time of the murders. According to the state's version of the offenses, the defendant planned these incoming and outgoing calls to buttress his alibi that he was otherwise occupied at the time of the murders.

of those murders. Rozzi told the defendant to tell him where he had been on the day of the murders, from the beginning to the end of the day. The defendant, however, began by informing Rozzi that he was at the Comfort Inn between 5 and 7 p.m. that day, and that he went to the mall in Stamford later that evening. Thereafter, he returned to the Comfort Inn where Latosha McKnight, the defendant's girlfriend, joined him sometime between 9 and 10 p.m. According to the defendant, McKnight stayed with him in his motel room until 2 or 3 a.m. the next morning. The defendant further indicated that he could not recall his whereabouts prior to 5 p.m. on the day of the murders.

During his initial closing argument, the state's attorney stated: "Remember FBI agent . . . Rozzi? *The defendant wanted to talk to him after he had a couple of days to think about it.* Following his arrest, the defendant wanted to clear up something. So the defendant, professing his innocence to Rozzi—what are the very first words out of the defendant's mouth? Check my cell phone. How would somebody, if not actually at the crime scene, know what was in the media as far as the time the murders were committed? And you have all the exhibits here. Nowhere in any media article presented in this trial is the time of these murders published, neither on TV that you saw last week, and not newspaper articles that were [introduced] early in the trial. All any of them say is sometime Thursday night. And they include the obvious fact after the two had returned from the grocery store. That's all they said. So how would somebody who wasn't there, who had nothing to do with it, who didn't commit these crimes—at that point [he] had a couple of days to think about it—know to key an FBI investigator into his cell phone where amazingly—the rest of the cell phone record is before you—amazingly the busiest one quarter of an hour in the entire cell phone record—I don't mean

this day, I mean the days before and after—starts right around when [the victims] got home . . . .

\* \* \*

*[A]fter the defendant was arrested . . . [he] had a chance to think things over for a couple of days, tried to alibi himself.*" (Emphasis added.)

In his closing argument, defense counsel vigorously sought to discredit Lee. Among other inconsistencies in Lee's testimony, defense counsel noted that Lee had given one statement in which she claimed to have seen the defendant leave the victims' house after the murders and flee up the street on foot. Defense counsel noted further that, in a later statement, Lee indicated that the defendant had driven away from the murder scene. According to defense counsel, Lee's story changed because the state had received information that the defendant had preexisting leg injuries that would have made it impossible for him to run from the scene of the murders as Lee originally had reported.

During his rebuttal argument, the state's attorney stated: "McKnight backed up the defendant's claim [that] he indeed was at the Comfort Inn the night of January 7. Of course, as we know, that was way, way after the time the murders were committed. But that kind of highlights the point that the circumstances under which the defendant spoke to the FBI in North Carolina are so telling. He was arrested. *He waited— I can't remember how long—at least a couple days, thought about things* . . . [and] [p]ut in a request that Agent . . . Rozzi come talk to him. The defense completely slid by this whole thing, didn't even talk about it, [does not] want you to think about it. Remember, the defendant asked for the FBI, not vice versa. It wasn't the FBI's case. [The FBI agents] had done their job. They didn't know anything about the Connecticut murder case, at least in [any] detail whatsoever. Remark-

ably, the very first words out of the defendant's mouth were, 'check my cell phone.' The most active one [quarter] of an hour in this entire twenty-five day, $4200 bill." (Emphasis added.)

The state's attorney argued further: "Certainly, the defendant wasn't having any trouble traveling up and down the east coast back in the fall of 1998. He had no trouble going to New York City, shopping for drugs, escorting his girlfriends around. All of his associates . . . indicate [that] he was getting around fine. In fact, what did he himself have to say about his ability to get around? He did talk to Agent Rozzi. *He thought about things—what he was going to say to Rozzi before he talked to him.* Do you think if for a moment he actually had been physically impaired back in January of 1999 that he would have failed to point that fact out to Rozzi, [that he could not] even walk." (Emphasis added.)

With these facts in mind, we set forth the law applicable to the defendant's claim. "In *Doyle* [v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976)] . . . the United States Supreme Court held that the impeachment of a defendant through evidence of his silence following his arrest and receipt of *Miranda* warnings violates due process. The court based its holding [on] two considerations: First, it noted that silence in the wake of *Miranda* warnings is insolubly ambiguous and consequently of little probative value. Second and more important[ly], it observed that while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial. . . . The court . . . reaffirmed *Doyle*'s reasoning in *Wainwright* v. *Greenfield*, 474 U.S. 284, 290, 106 S. Ct. 634, 88 L. Ed. 2d 623 (1986),

in which it held that the defendant's silence following his arrest and receipt of *Miranda* warnings could not be used at trial to rebut his defense of insanity. The court reasoned: The point of the *Doyle* holding is that it is fundamentally unfair to promise an arrested person that his silence will not be used against him and thereafter to breach that promise by using the silence to impeach his trial testimony. It is equally unfair to breach that promise by using silence to overcome a defendant's plea of insanity. . . .

"[A]lthough *Doyle* prohibits impeachment of a defendant with evidence of his post-*Miranda* silence, we expressly stated in [*State* v. *Plourde*, 208 Conn. 455, 468, 545 A.2d 1071 (1988), cert. denied, 488 U.S. 1034, 109 S. Ct. 847, 102 L. Ed. 2d 979 (1989)] that it also is fundamentally unfair . . . and, therefore, a deprivation of due process, for the state to use evidence of a defendant's post-*Miranda* silence as affirmative proof at trial . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Montgomery*, 254 Conn. 694, 712–14, 759 A.2d 995 (2000). It therefore is constitutionally impermissible for the state to use a defendant's post-*Miranda* silence either as affirmative proof of guilt or to impeach the defendant.

We conclude, however, that the references of the state's attorney to the defendant's post-*Miranda* silence were not prohibited by the holdings of *Doyle* and its progeny. With respect to the defendant's statements regarding his cellular telephone, the state's attorney did not ask the jury to infer that the defendant's silence after his arrest was suggestive of guilt. Rather, the state's attorney merely was underscoring the fact that, in his view, the defendant had contrived an alibi *before* committing the murders—namely, the record of incoming and outgoing cellular telephone calls at or around the time of the murders—and then, after his arrest and as part of an orchestrated, preconceived plan to exculpate

himself, he contacted Rozzi to inform him of that alibi. Moreover, the jury had no knowledge that the defendant had met with the two detectives from Connecticut several days earlier. Similarly, the state's attorney did not improperly impugn the defendant's silence when he suggested that, because the defendant had planned what he was going to say before requesting to speak with Rozzi, he would have told Rozzi about any injury that he purportedly had on the day of the murders if he indeed had sustained such an injury. Although the state's attorney adverted to the fact that the defendant had waited several days before asking to speak with Rozzi, that reference contained no express or implied connection between the defendant's silence and his guilt.

## B

The defendant next claims that the state's attorney, in his rebuttal argument, improperly assailed the defendant's character by stating that he was capable of, and willing to commit, uncharged and unproven acts of violence against Lee, one of the state's witnesses. The state contends that the challenged statements were not improper because they were reasonable comments on the evidence and, even if they were improper, they nevertheless were not part of a pattern of egregious misconduct requiring reversal. We conclude that the challenged remarks do not warrant reversal of the defendant's conviction.

Certain additional facts are necessary to our disposition of this claim. During the state's rebuttal argument, the state's attorney alluded several times to Lee's reason to fear the defendant. Specifically, in referring to a nightmare that Lee claimed to have had about the defendant and Russell, the state's attorney commented: "[T]hat the Peelers would seek revenge on [Lee] for testifying is not an illogical concern at all, all things

considered here." Later, in positing why Lee had written letters to her former landlord disavowing any knowledge of the killings, the state's attorney argued: "Why is she writing letters? You know clearly from those surveillance recordings what [the landlord's] position on this whole thing was. He was vehement [that] she should keep her mouth shut. I don't blame him. This is all about murdering witnesses." Finally, the state's attorney argued that Lee's initial statement to the police was incomplete or inaccurate because Lee had "seen the night before what the Peelers do to witnesses."

We reject the defendant's claim that these comments were improper. First, there was extensive admissible evidence concerning the defendant's motive for committing the crimes charged, namely, to eliminate crucial state witnesses who were capable of linking Russell, the defendant's brother, to extremely serious crimes, including murder. Indeed, Lee herself testified that she had been threatened by Garner, an apparent coconspirator, who warned her that both she and her entire household would be killed if she told anyone about the murders of Brown and Clarke. Furthermore, the comments of the state's attorney followed defense counsel's closing argument in which he attacked Lee's credibility by referring to inconsistencies in her direct testimony, her prior statements to the police and a letter that she had written to her former landlord. The challenged remarks, therefore, provided the jury with an alternate explanation for the inconsistencies highlighted by defense counsel. See, e.g., *State* v. *Burton*, 258 Conn. 153, 169, 778 A.2d 955 (2001) (prosecutor may present jury with alternative explanation for inconsistencies in witness' statements when defendant has engaged in lengthy attack on witness' credibility). Consequently, it was not unreasonable for the state's attorney to argue that Lee had reason to fear the defendant

and that this fear had caused her to change her version of the facts.

C

The defendant's final claim of misconduct involves the following statement by the state's attorney during his rebuttal argument: "The incredible thing about . . . Lee is she's a survivor. I don't mean her [medical condition] and her crack. I mean she survived that night, January 7, 1999. If the defendant had his brother's Glock semi-automatic pistol, she wouldn't be alive, no question. The problem with using the six shooter is [that the defendant] didn't have a spare bullet for [Lee]. He had to shoot . . . Clarke twice because she made it up to the telephone. I don't think he had to shoot [Brown] four times, but he did. He didn't have another bullet. Who would have cared if [Lee] got killed?"

The defendant contends that the foregoing argument was improper inasmuch as the state adduced no evidence that the defendant either had attempted to kill or had planned to kill Lee. We agree. "A prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument." (Citations omitted; internal quotation marks omitted.) *State* v. *Alexander*, 254 Conn. 290, 306, 755 A.2d 868 (2000). This argument was nothing more than rank speculation designed to inflame the passions of the jurors against the defendant.

Although the comments were highly improper, we are persuaded that, in the particular context of this case, they did not deprive the defendant of a fair trial. Although, in other circumstances, the argument might be so prejudicial as to require a new trial, in the present case, there was ample evidence properly before the jury regarding the willingness of the defendant and his

coconspirators to resort to murder to silence prospective witnesses. Indeed, the state's evidence established convincingly that Brown and Clarke were murdered for that very reason. We find it significant, also, that defense counsel made no contemporaneous objection to the challenged remarks, presumably because he did not "view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." *State* v. *Reynolds*, supra, 264 Conn. 165. Finally, the trial court's instruction to the jury that the arguments of counsel are not evidence likely mitigated any harm caused by the improper argument.[25] See id., 131 (presumption that jury follows court's instructions absent contrary indication). For all of the foregoing reasons, we conclude that the improper argument of the state's attorney does not mandate reversal of the defendant's conviction.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[25] The trial court instructed the jury in relevant part: "You should keep in mind [that] the arguments and statements by the attorneys in final arguments or during the course of the case were not evidence. You should not consider as evidence their recollections of the evidence nor their personal beliefs as to any facts or as to the credibility of any witness or any facts which any attorney may have presented to you in argument from that attorney's knowledge which [were] not supported by the evidence during the course of the trial. Furthermore, I emphasize to you that if there was any difference between what any attorney recalls as the evidence or what I recall as the evidence and what you recall as the evidence, it is your recollection that controls. Follow your recollection, not anyone else's. . . ."