STATE OF CONNECTICUT *v.* SHAWN CROCKER
(AC 23269)

Flynn, West and McDonald, Js.

616

Argued March 17, 2003—officially released July 6, 2004

*Adele V. Patterson,* assistant public defender, for the appellant (defendant).

*Rita M. Shair,* senior assistant state's attorney, with whom were *Michael Dearington,* state's attorney, and, on the brief, *David J. Strollo,* assistant state's attorney, for the appellee (state).

*Opinion*

MCDONALD, J. The defendant, Shawn Crocker, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a and criminal possession of a firearm in violation of General Statutes § 53a-217. On appeal, the defendant claims that (1) the trial court improperly disqualified his counsel of choice in violation of the sixth amendment to the federal constitution, (2) the court improperly permitted a witness to testify as an expert as to street gangs, (3) the court improperly permitted the state to introduce testimony concerning gang activities that was inflammatory and prejudicial, (4) the court improperly admitted into evidence the prior testimony of a witness in violation of the defendant's sixth amendment right of confrontation, (5) the court improperly admitted into evidence the prior inconsistent statement of an unavailable witness and (6) the summation of the assistant state's attorney violated the defendant's due process rights, his right to the assistance of counsel and his right to a fair trial. We uphold the trial court's rulings and affirm the judgment of conviction.

The jury reasonably could have found the following facts. Shortly before 7:30 p.m. on October 27, 1997, George David Wright drove a stolen Jeep Cherokee to the Quinnipiac Terrace housing complex in New Haven, also known as "the Island." The victim, Daryl Price, was in the passenger seat of the Jeep, and Calvin Taylor was seated in the back. At the housing complex, Wright and Taylor exited the vehicle, and Tacuma Grear approached the Jeep to talk to the victim. They talked about the killing of Grear's brother, Corey Grear, which had occurred approximately one week earlier, for which the victim had apologized. Corey Grear was a friend of the defendant, and the defendant had held him in his arms after Grear was fatally shot by the victim. The defendant had witnessed the victim shoot Corey Grear. Corey Grear was also a member, as was the defendant, of the Island Brothers, a street gang into which the victim had been introduced and sponsored by the defendant. As his sponsor, the defendant was responsible for disciplining the victim should the victim kill a fellow gang member.

As Tacuma Grear walked away from the Jeep, the defendant had come up to the driver's side of the Jeep carrying a handgun. He then leaned into the Jeep and fired four times into the vehicle. Two .45 caliber bullets hit the victim, killing him, and two other bullets were found in the Jeep.

I

The defendant claims that the court, *Hartmere, J.*, improperly disqualified his attorney, Michael Dolan, in violation of the sixth amendment.[1] We disagree.

The following facts are relevant to our resolution of that issue. The defendant was arrested in connection with the victim's murder in November, 1997, and Dolan

---

[1] The defendant makes no claim under the Connecticut constitution.

represented him at the probable cause hearing, which began on December 23, 1997. At the probable cause hearing, the state called Tacuma Grear. Grear testified that he had talked to the victim shortly before the victim was shot in the front passenger seat of the Jeep. The defendant was near the Jeep as Grear talked to the victim. After talking to the victim, Grear walked away and heard gunshots. Grear testified, contrary to the report of his police interview conducted two days after the shooting, that he did not see the defendant with a gun in his hand prior to the shooting. Grear also testified, contrary to the police report, that he did not see the defendant standing near the open window of the Jeep when gunshots were fired.

Initially, Grear testified on direct examination that he did not look back when he heard the gunshots, but he later testified that he did look and saw a person wearing a hooded sweatshirt standing near the driver's side of the Jeep. He denied seeing the individual's face. He also testified that he saw that person walking toward the front of the Jeep with a gun in his hand. Grear also denied telling the police that he saw the defendant approach the rear portion of the Jeep with a gun in his hand before the shooting and that he saw him walk away from the operator's side of the Jeep with the gun after the shooting. Grear testified that because he did not see the defendant shoot the victim, his testimony had "no weight." He also stated that he did not fear the Island Brothers because he, himself, was associated with them.

When cross-examined by Dolan, Grear testified that the police attempted to have him implicate the defendant and threatened him unless he did so. No testimony was elicited that Dolan was currently representing Grear in a criminal matter in the geographical area court. After probable cause was found, the case proceeded to jury selection. In May, 1998, during jury selec-

tion, the court was informed that Dolan represented Tacuma Grear at the same time that Dolan represented the defendant.

The state represented the following facts to the court, which Dolan did not dispute: On December 23, 1997, Tacuma Grear was called as a witness by the state at the defendant's probable cause hearing and was cross-examined by Dolan. At that time, Dolan had an appearance on file on behalf of Tacuma Grear in the geographical area court and had engaged in substantial plea negotiations on Grear's behalf. On August 22, 1997, Dolan had filed an appearance on behalf of Grear in an unrelated criminal case and represented him until January 22, 1998, when Judge Simon, presiding at the geographical area court number seven, brought up the conflict of interest. Although two other witnesses at that probable cause hearing were cross-examined by Dolan about their prior convictions and offers made in pending cases, Dolan did not cross-examine Grear as to the offers that were made to Grear in his pending case.

The state also represented that on December 23, 1997, at Dolan's office, Grear gave a signed statement to Dolan or to Dolan's investigator regarding the defendant's case, which was substantially similar to Grear's testimony at the probable cause hearing that day.

"To clarify some facts," Dolan then told the court that when he filed his appearance on behalf of the defendant, he did not realize that Tacuma Grear was a witness to the homicide and that when he learned that Grear was a witness, he did not believe that he had a duty to disclose that he represented the defendant and Grear at the same time. Dolan stated that he did not question Grear about any potential offers from the state about his pending case because Grear was not a damaging witness against the defendant. Dolan also stated that both the defendant and Grear were aware of the

dual representation and had waived any possible conflict of interest.

The court had been informed that Grear's present counsel had stated that Grear would be willing to waive any conflict, and the court assumed that the defendant would also be willing to waive any conflict. The court, however, remarked that it was concerned about the defendant's upcoming trial, stating: "One of the more troubling aspects of the case is trying to foresee what would happen down the road at a trial. And as experienced counsel are both aware, that is frequently impossible and always difficult to do. And the problem in this situation is, for this court, is attempting—assuming waivers by both counsel, attempting to foresee what potential prejudice would inure to [the] defendant's detriment during a trial. And by that, I mean, would [the defendant] be prejudiced in front of the jury by the examination by the state as to a change in Mr. Grear's testimony and the reasons therefor. And that examination by the state could focus on whether Mr. Grear had changed his testimony from that initial statement to the police, whether he had changed that testimony based on his relationship with his attorney." The court added, concerning Grear's waiver, that the interview of Grear was conducted, to the court's understanding, "by an investigator of Mr. Dolan's and Mr. Dolan being in and out of the room at the time . . . ."

Having found that Dolan simultaneously had represented the defendant and Grear throughout the probable cause hearing, the court determined that Dolan suffered from a conflict of interest. The court then determined that the defendant could not validly waive the conflict because of Grear's differing statements to the police and to Dolan and his investigator. The court stated that Grear's probable cause hearing testimony and Grear's anticipated testimony at trial "might lead to the appearance of impropriety, which could affect

the jury and prejudice [the defendant] in the outcome of this trial. Of course, there's also the appearance of impropriety in terms of the general public." The court then disqualified Dolan and ordered that the defendant be afforded a new probable cause hearing with different counsel.

We next review pertinent portions of the record from the second probable cause hearing held in July, 1998, when Dolan no longer represented Grear or the defendant. At that hearing, when called by the state, Grear testified that the victim was seated in the front passenger side of the Jeep. When he heard gunshots, Grear saw someone leaning into the vehicle. Grear then testified that the statement he gave at the office of the state's attorney on June 18, 1998, was correct. In that statement, Grear stated that he saw someone who looked to be the defendant leaning into the driver's side of the vehicle where the victim was a passenger and saw flashes coming from the extension of that person's arm. On cross-examination, Grear testified that he did not see the defendant shoot the victim. On redirect examination, Grear testified that the person with his body extended into the vehicle in which the victim was sitting looked like the defendant.

At the defendant's subsequent trial, Grear testified for the state that he talked to the police two days after the shooting and again on June 18, 1998, when he gave the police a tape-recorded statement, which was introduced into evidence. After reviewing that statement, Grear testified that when four to five gunshots were fired, he saw someone who looked like the defendant leaning toward the driver's side window of the vehicle in which the victim was a passenger and saw flashes. Grear testified that at the time of the defendant's first probable cause hearing on December 23, 1997, Dolan was still Grear's attorney in a case unrelated to the defendant's case. Grear testified that Dolan had told

him one week before the December 23, 1997 probable cause hearing that Grear could not be a witness and have the same attorney as the defendant. Grear testified that he later gave a written statement to a private investigator in Dolan's office on December 23, 1997, in which he stated that he did not see the defendant shoot the victim.

Grear testified that he might have told the police that he knew the defendant had shot the victim when Grear initially talked to the police on October 29, 1997. Grear also testified that when he talked to the police two days after the shooting, he was concerned about clearing himself of the victim's homicide because it was Grear's brother who had been killed previously, apparently by the victim. Grear testified that he did not name the defendant in the October interview; rather, it was the police who gave Grear the defendant's name after Grear had described him. Grear testified that the description would fit the defendant. On cross-examination, Grear testified that Dolan was his attorney when the victim was shot and at the time of the defendant's first probable cause hearing. He testified that he did not identify the defendant as the individual who shot the victim at that hearing.

In summation, defense counsel twice stated that Tacuma Grear was at the Jeep's window, from where the gunshots were fired, and that Tacuma Grear was the brother of Corey Grear. In summation, the state's attorney argued that Dolan had represented Grear and most of the defendant's witnesses at one time. The state's attorney pointed out that Grear had changed his story after he went to Dolan's office on December 23, 1997, the day the first probable cause hearing began.

In *State* v. *Peeler*, 265 Conn. 460, 467, 828 A.2d 1216 (2003), cert. denied, 541 U.S. 1029, 124 S. Ct. 2094, 158 L. Ed. 2d 710 (2004), the trial court had disqualified the defendant's attorney because that attorney was to be

a witness at the trial. Our Supreme Court reversed that disqualification because that attorney was not a necessary witness. Id., 462–63. Citing *Wheat* v. *United States*, 486 U.S. 153, 164, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988), our Supreme Court held that we must accord the defendant's choice of counsel a presumption in favor of accepting that choice. *State* v. *Peeler*, supra, 473.

In *Peeler*, our Supreme Court stated: "When a defendant's selection of counsel seriously endangers the prospect of a fair trial, a trial court justifiably may refuse to agree to the choice. Thus, a trial court may, in certain situations, reject a defendant's choice of counsel on the ground of a potential conflict of interest, because a serious conflict may indeed destroy the integrity of the trial process." Id. The *Peeler* court observed that a trial court's decision to disqualify a defendant's counsel of choice is entitled to deference on appeal. Id., 474.

Our Supreme Court has stated: "Our state and federal constitutions guarantee a criminal defendant the right to assistance of counsel. . . . As an adjunct to this right, a criminal defendant is entitled to be represented by an attorney free from conflicts of interest. . . . The trial court has broad discretionary power to determine whether an attorney should be disqualified for an alleged . . . conflict of interest. . . . The ultimate issue is whether the trial court could reasonably have reached the conclusion that it did." (Citations omitted; internal quotation marks omitted.) *State* v. *Webb*, 238 Conn. 389, 417, 680 A.2d 147 (1996).

In *Wheat* v. *United States*, supra, 486 U.S. 155, the defendant sought to retain an attorney who was burdened by a conflict of interest. The United States Supreme Court in *Wheat* stated that "the purpose of providing assistance of counsel is simply to ensure that criminal defendants receive a fair trial . . . and that

in evaluating Sixth Amendment claims, the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such. . . . Thus, while the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." (Citations omitted; internal quotation marks omitted.) Id., 159.

The *Wheat* court rejected the notion that a defendant's waiver cures the problem related to a conflict of interest, recognizing that federal courts have an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." Id., 160. Because of the difficulties associated with a court's determination of whether to disqualify counsel, the Supreme Court held that "substantial latitude" must be afforded a court's decision refusing a waiver of a conflict of interest, "not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." Id., 163.

The United States Court of Appeals for the Second Circuit has held: "The Sixth Amendment commands that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.' U.S. Const. amend. VI. This right to counsel applies to the States through the Fourteenth Amendment. . . . The [United States] Supreme Court has acknowledged that this right to counsel includes a criminal defendant's qualified right to be represented by the counsel of his choice. . . . This qualified right

may be overcome when it is outweighed by competing interests in the fair administration of justice or maintaining orderly trial procedures. . . . Although qualified, this right to counsel of choice may not be denied arbitrarily." (Citations omitted.) *Lainfiesta* v. *Artuz*, 253 F.3d 151, 154 (2d Cir. 2001), cert. denied sub nom. *Lainfiesta* v. *Greiner*, 535 U.S. 1019, 122 S. Ct. 1611, 152 L. Ed. 2d 625 (2002).

"There are many situations in which a . . . court can determine that disqualification of counsel is necessary. The most typical is where the . . . court finds a potential or actual conflict in the chosen attorney's representation of the accused, either in a multiple representation situation . . . or because of the *counsel's prior representation of a witness* or co-defendant . . . ." (Citations omitted; emphasis added.) *United States* v. *Locascio*, 6 F.3d 924, 931 (2d Cir. 1993).

In *United States* v. *Stewart*, 185 F.3d 112, 119–22 (3d Cir.), cert. denied, 528 U.S. 1063, 120 S. Ct. 618, 145 L. Ed. 2d 512 (1999), the United States Court of Appeals for the Third Circuit upheld the disqualification of the defendant's attorneys because of a conflict of interest. In *Stewart*, the defendant was originally represented by a law firm that also represented several individuals who would be testifying against the defendant at his criminal trial. Id., 119. The Third Circuit, in upholding the disqualification, stated: "*Conflicts of interest arise whenever an attorney's loyalties are divided, and an attorney who cross-examines former clients inherently encounters divided loyalties.*" (Emphasis added; internal quotation marks omitted.) Id., 121.

In *Perillo* v. *Johnson*, 205 F.3d 775, 780 (5th Cir. 2000), the United States Court of Appeals for the Fifth Circuit affirmed the District Court's finding that a defendant's counsel "labored under an actual conflict of interest that adversely affected counsel's presentation" of the

defense due to counsel's prior representation of a state's witness who originally was charged with the murders that the defendant stood accused of committing. The Fifth Circuit stated: "*An attorney who cross-examines a former client inherently encounters divided loyalties. . . . In these circumstances, counsel is placed in the equivocal position of having to cross-examine his own client as an adverse witness. His zeal in defense of his client the accused is thus counterpoised against solicitude for his client the witness.*" (Citations omitted; emphasis added; internal quotation marks omitted.) Id., 801–802.

In this case, we conclude that the disqualification of Dolan rested on the ground that an actual conflict of interest existed. Dolan simultaneously represented the defendant and an eyewitness to the victim's murder who had disavowed any statement implicating the defendant while visiting Dolan's office and so testified at the defendant's December 23, 1997 probable cause hearing. Grear's position as the state's eyewitness to the victim's murder had placed Grear "in a direct adversarial relationship"; *In re Garber*, 95 N.J. 597, 604, 472 A.2d 566 (1984); with the defendant, the person the police claimed Grear had identified as the killer and who was charged formally with the murder. See id. The interests of Grear and the defendant were therefore in "acute" conflict. Id. Although Grear's recantation did exculpate the defendant, should Grear, as he did in part, retract his recantation, that would inculpate the defendant. Grear's recantation was "inherently vulnerable"; id.; and his position as a recanting witness also resulted in Grear's confronting legal pitfalls, which required that he be given careful, objective and sound legal advice. See id. He could face criminal charges pertaining to his testimony. In that situation, Dolan could not give Grear "complete and undivided loyalty." Id., 605. That created an unavoidable and irreconcilable conflict with the pro-

fessional duties Dolan had undertaken. See id., 605–606. Absent that conflict, the defendant's trial counsel could, and did, twice point the finger of guilt toward Tacuma Grear, whose brother, Corey Grear, had been killed by the victim and who was near the front of the Jeep.

Dolan also "created the opportunity, whether or not actually exploited"; id., 608; of influencing Grear in a manner favorable to the defendant. Id.[2] The potential for that clearly could have had a deleterious effect on the defendant and also on the public itself, which has the greatest stake in the propriety of the legal relationships that are created to administer criminal justice properly. See id. "Under no circumstances and by no stretch of the imagination could an attorney with any propriety ever represent an eyewitness or a material witness to a crime and also represent, or become professionally associated with, the individual charged with the commission of such a crime." Id.

We conclude that the conflict of interest in this case was more than likely and that the seriousness of that conflict was substantial. See *State* v. *Peeler*, supra, 265 Conn. 475.

We will assume that both the defendant and Grear would have waived any conflict of interest. In those circumstances, the defendant's waiver of a conflict of interest must be rejected because of his counsel's diminished effectiveness. In *Phillips* v. *Warden*, 220 Conn. 112, 114, 595 A.2d 1356 (1991), our Supreme Court ordered a new trial because a defense attorney did not

---

[2] Grear testified at trial that he might have told the police on October 29, 1997, that he knew the defendant shot the victim. He further testified that Dolan had told him one week before December 23, 1997, that Dolan could not continue as his attorney if Grear was a witness as to the defendant's case. On December 23, 1997, Grear told Dolan's investigator that he did not see the defendant shoot the victim. At the defendant's first probable cause hearing, Dolan continued as Grear's attorney and, at that hearing, Grear did not identify the defendant as the one who shot the victim.

withdraw when that attorney's conviction for murder diminished his effectiveness at trial. Should Dolan have continued as the defendant's attorney, a trial jury would have been required to accept Dolan's advocacy on behalf of the defendant and ignore his relationship with Grear. That required Dolan's disqualification. See id., 141–42.

In *State* v. *Loyal*, 164 N.J. 418, 421, 753 A.2d 1073 (2000), the Supreme Court of New Jersey held that the trial court did not abuse its discretion when it declared a mistrial after learning that the defendant's counsel previously had represented a "material, recanting State's witness . . . ." In *Loyal*, the state called a witness who was present at the scene of the murder and had given a statement to the police implicating the defendant, but who testified that the statement she provided to the police was false. Id., 422–23.

Subsequently, the trial court learned that the defendant's counsel previously had represented the witness two years earlier as her public defender. Id., 424. Neither the defendant's counsel nor the witness remembered the representation, which was unrelated to the charges pending against the defendant, and both the witness and the defendant agreed to waive any potential conflict of interest. Id., 424–25. Because of the conflict of interest and its effect on the court system, however, the court declared a mistrial. Id., 426.

On appeal, the Supreme Court of New Jersey stated that the primary basis for the trial court's action was "the vindication of the public interest in a fair trial." Id., 443. The Supreme Court in *Loyal* concluded that the trial court properly had considered the independent interest the public had in the outcome of the defendant's case. Id. Quoting its decision in *In re Garber*, supra, 95 N.J. 614, the *Loyal* court stated: "The public itself has the greatest stake in the propriety of the legal relation-

ships that are created to properly administer criminal justice. . . . Clearly, the public interest in the administration of criminal justice in the circumstances of this case compelled the unbiased and unstinted representation of [the witness]." *State* v. *Loyal*, supra, 164 N.J. 440. The court stated that "in some circumstances a lawyer's conflict of interest may jeopardize not only the defendant's right to effective representation, but also the institutional interest in the rendition of just verdicts in criminal cases." (Internal quotation marks omitted.) Id., 443.

In considering the application of the sixth amendment to this case, we recognize that courts have "an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that the legal proceedings appear fair to all those who observe them." *Wheat* v. *United States*, supra, 486 U.S. 160. Dolan's conflict was the kind that would have undermined the fairness of the trial process. See *State* v. *Peeler*, supra, 265 Conn. 475. When an attorney's conflict, actual or potential, may result in the inadequate representation of a defendant or jeopardize the court's institutional interest in the rendition of a just verdict, a trial judge has the discretion to disqualify an attorney or to decline a proffer of waiver. Id., 474–75; *United States* v. *Fulton*, 5 F.3d 605, 612 (2d Cir. 1993).

We conclude that the trial court's concern for the public perception of the attorney's conduct was justified and supported Dolan's disqualification under the sixth amendment.

II

The defendant claims that the trial judge, *Lager, J.*, improperly permitted a police officer, Detective Richard Pelletier, to testify as an expert as to street gangs. The defendant claims that (1) the witness was not qualified properly as an expert, (2) hearsay testimony

improperly was admitted for substantive use and (3) the witness improperly was allowed to give expert evidence on the ultimate issues of identity and intent. We disagree.

The following facts are relevant to our resolution of the defendant's claim. At the trial, there was evidence that the Island Brothers were a street gang that operated in the "Island" housing complex. The defendant was a member of the Island Brothers, as was the victim and Corey Grear. The defendant was the individual who had introduced the victim into the gang. Approximately nine days before the victim in this case was killed, Corey Grear was shot and killed by the victim.

The state called Pelletier as a witness, and he testified that he had been with the New Haven police department for thirteen years and had been a detective for the past six years. Pelletier stated that between 1991 and 1994, he was a community police officer assigned to the "Island" complex, where the victim was killed. Pelletier also testified that from 1994 through 1999, he was assigned to the state police gang task force. As Pelletier began to demonstrate hand signals used to identify one as being a member of the Island Brothers, the defendant objected and the court excused the jury.

The state informed the court that it intended to establish Pelletier as an expert in the area of gangs, including the Island Brothers. The state told the court that it was "attempting to offer a motive that [the defendant] killed [the victim] in retaliation for the death of his good friend and fellow Island Brother member, Corey Grear. And it ties into the Island Brothers because of their code, their ethos that when you bring someone and introduce someone into the gang and they mess up, in this case killing another gang member, you're responsible to enforce and take enforcement action against the person who messed up." The defendant argued that Pelletier's

testimony would be based only on hearsay and not based on Pelletier's skill, training or knowledge.

Outside of the jury's presence, Pelletier then testified that the defendant had told him that he was a member of the Island Brothers gang and that Pelletier had seen the defendant using the Island Brothers' identifying hand signals. Pelletier further testified, in response to questions from the court, that while he was with the state police gang unit, he attended a number of schools that teach gang identification, gang investigation, undercover operations and electronic surveillance. Pelletier also testified that from his assignments, he was familiar with the operation of the Island Brothers' selling of drugs through subgroups in different sections of the housing complex. That operation was concerned with protecting, by assault or murder, the gang's territory for selling drugs. Pelletier also testified that as a police officer, it was his practice to rely on information provided by members of the community and individuals who were arrested. Pelletier also testified that it was common practice for members of the gang task force to develop relationships with gang members and people in the community in order to obtain information about the activities of a given gang.

The court, pursuant to § 7-4 of the Connecticut Code of Evidence, found that Pelletier qualified as an expert. The court stated: "I believe Detective Pelletier's responses have provided the court with an adequate foundation to conclude that debriefing of gang members, informal conversations, anonymous citizen reports are all of a type of information relied on by investigators involved in gang investigations in reaching opinions as to such things as the organization of a gang and any rules that they may have."

A

The defendant claims that Pelletier was not properly qualified as an expert because "the court had no infor-

mation about his training in gangs or whether any standard exists to establish a person's gang expertise." (Internal quotation marks omitted.) It is the defendant's contention that Pelletier was a "self-declared expert." We disagree.

"As a threshold matter, we set forth the standard by which we review the trial court's determinations concerning the [admissibility] of evidence. The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling, and only upset it for a manifest abuse of discretion. . . . [Thus, our] review of such rulings is limited to the questions of whether the trial court correctly applied the law and reasonably could have reached the conclusion that it did. . . .

"Concerning expert testimony specifically, we note that the trial court has wide discretion in ruling on the admissibility of expert testimony and, unless that discretion has been abused or the ruling involves a clear misconception of the law, the trial court's decision will not be disturbed. . . . Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Internal quotation marks omitted.) *State* v. *Vega*, 259 Conn. 374, 392, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002).

In *State* v. *Henry*, 72 Conn. App. 640, 658–59, 805 A.2d 823, cert. denied, 262 Conn. 917, 811 A.2d 1293 (2002), we found that the trial court did not abuse its discretion in permitting Pelletier to testify as an expert on gangs, recognizing that he had an "intimate knowl-

edge" of the Island Brothers and that his frequent con-
tacts with members of the gang put him in a "unique
position to evaluate the information they gave him
regarding their activities and motivations." Id., 658.

Section 7-2 of the Connecticut Code of Evidence pro-
vides in relevant part: "A witness qualified as an expert
by knowledge, skill, experience, training, education or
otherwise may testify in the form of an opinion or other-
wise concerning . . . specialized knowledge, if the tes-
timony will assist the trier of fact in understanding the
evidence or in determining a fact in issue."

Pelletier testified that he had experience in the area
of the "Island" complex as a community police officer
from 1991 through 1994 and with the state police gang
unit investigating the Island Brothers from 1994 through
1999. That investigation concerned the activity of the
Island Brothers' selling of drugs and involved informa-
tion about that organization supplying drugs. Pelletier
learned that the Island Brothers would not allow those
not associated with them to sell drugs in the "Island"
housing complex. If someone did, the Island Brothers
would assault, shoot or kill that person.

During his assignment as a community police officer
at the "Island" complex, Pelletier would spend his entire
shift there daily. He was given the nickname "Cool
Breeze" by members of the Island Brothers and was
sometimes called on with his fellow officers to protect
the Island Brothers from rival gangs. With respect to the
identifying hand signal, members of the Island Brothers,
some of whom wore Island Brothers' tattoos, would
sometimes give that signal to Pelletier and other police
officers. Pelletier also testified that while he was a mem-
ber of the state gang task force, he attended several
schools about gangs. Pelletier testified that new mem-
bers had to be introduced, or spoken for, by one already
a member of the Island Brothers. If a new member

violated a rule of the gang, that member could be beaten or killed by the individual who brought the new member into the gang.

We conclude that the trial court properly found, on the basis of Pelletier's many years of contact with the Island Brothers and his training and investigations while with the state police gang task force, that Pelletier possessed the knowledge, skill, experience, training and education to testify concerning his knowledge, which is not commonly known, as to street gangs and, in particular, the Island Brothers. We further conclude that his testimony, in opinion form or otherwise, would assist the jury in understanding the evidence.

B

The defendant argues that hearsay evidence was introduced, under the guise of expert testimony, as to the historical ethos or code that a sponsoring member was responsible to enforce discipline on a new member. We recently rejected a similar claim in *State* v. *Henry*, supra, 72 Conn. App. 656–59. In *Henry*, the state sought to introduce into evidence the testimony of Pelletier to establish that the motive for a shooting was to "avenge the murder of a former member of the defendant's gang . . . ." Id., 643. In *Henry*, we rejected the defendant's claim that the trial court improperly admitted the testimony of Pelletier because the testimony was based on inadmissible hearsay. Id., 652.

"The fact that an expert opinion is drawn from sources not in themselves admissible does not render the opinion inadmissible, provided the sources are fairly reliable and the witness has sufficient experience to evaluate the information. . . . An expert may base his opinion on facts or data not in evidence, provided they are of a type reasonably relied on by experts in the particular field. . . . This is so because of the sanction

given by the witness's experience and expertise." (Internal quotation marks omitted.) Id., 657.

Pelletier's opinion in this case, as well, was based on facts that normally are relied on by experts on gangs. As we stated in *Henry*: "Police officers must rely on communications with gang members to gather intelligence and form opinions about gang activity because most gangs do not have bylaws, organizational minutes or any other normal means of identification." Id., 658.

*Henry* upheld the admission into evidence of Pelletier's testimony that the history of the Island Brothers[3] would support those gang members joining together to avenge the killing of one of their members by a rival gang. Id., 658–59. In this case, Pelletier described the historical obligation of a sponsor of a new gang member to discipline a gang member who may have killed a fellow gang member. Following *Henry*, we uphold the decision of the trial court.

C

The defendant claims that Pelletier improperly was allowed to give expert testimony on the ultimate issues of identity and intent. We disagree.

The jury was told that Pelletier's testimony was limited to motive.[4] Pelletier never testified that the defendant was the perpetrator of the crime. Rather, it was left to the jury to decide, considering all the evidence, whether the defendant was the individual who killed the victim. See *State* v. *Walton*, 227 Conn. 32, 61–62, 630 A.2d 990 (1993). Because Pelletier's testimony was limited to the issue of motive, it was admitted into evidence properly. See *State* v. *Correa*, 241 Conn. 322, 356, 696 A.2d 944 (1997).

---

[3] See *State* v. *Ashe*, 74 Conn. App. 511, 513 n.5, 812 A.2d 194, cert. denied, 262 Conn. 949, 817 A.2d 108 (2003).

[4] See footnote 5.

## III

The defendant claims that the court, *Lager, J.,* improperly admitted gang related evidence and deprived him of a fair trial. The defendant claims that the court improperly permitted the state to introduce Pelletier's testimony, two photographs depicting the defendant with members of the Island Brothers making gang "signs" and evidence of a contemporaneous trial involving other members of the Island Brothers. We disagree.

"Although relevant, evidence may be excluded by the trial court if the court determines that the prejudicial effect of the evidence outweighs its probative value. . . . Of course, [a]ll adverse evidence is damaging to one's case, but it is inadmissible only if it creates undue prejudice so that it threatens an injustice were it to be admitted. . . . The test for determining whether evidence is unduly prejudicial is not whether it is damaging to the defendant but whether it will improperly arouse the emotions of the jury. . . . The trial court . . . must determine whether the adverse impact of the challenged evidence outweighs its probative value. . . . Finally, [t]he trial court's discretionary determination that the probative value of evidence is not outweighed by its prejudicial effect will not be disturbed on appeal unless a clear abuse of discretion is shown. . . . [B]ecause of the difficulties inherent in this balancing process . . . every reasonable presumption should be given in favor of the trial court's ruling. . . . Reversal is required only whe[n] an abuse of discretion is manifest or whe[n] injustice appears to have been done." (Internal quotation marks omitted.) *State* v. *Peeler,* 267 Conn. 611, 637, 841 A.2d 181 (2004).

The following facts are relevant to our resolution of the defendant's claim. When the court found that Pelletier was qualified to render an opinion as to street

gangs, it would not permit him to testify as to the Island Brothers' involvement with narcotics. The court also found that the probative value of Pelletier's testimony outweighed any prejudicial value it contained and stated that the jury would be provided with a limiting instruction as to the use of his testimony. Thereafter, Pelletier testified. At the conclusion of Pelletier's testimony, the court instructed the jury as follows: "I want to give you an instruction that as to the testimony from Detective Pelletier that the defendant admitted to Detective Pelletier that he was a member of the Island Brothers, you are not to infer from this evidence that the defendant committed the crimes charged in this case."[5]

A

The defendant first claims that the court improperly permitted the state to introduce into evidence the testimony of Pelletier because "he was allowed—as an expert—to give the jury irrelevant evidence, which was used by the state to play on the jury's prejudice and fears in urging conviction." We disagree.

Pelletier's testimony was clearly relevant. Pelletier's testimony regarding motive tended to establish that the defendant killed the victim, whom the defendant had

---

[5] During its final instructions to the jury, the court stated: "You will recall that Detective Pelletier testified that some years before 1997, the defendant admitted to him that he was a member of the Island Brothers. You will also recall at the time of this testimony, I instructed you that you are not to infer from this evidence that the defendant committed the crimes with which he is charged. This evidence was offered by the state and admitted for one purpose only, to allow you to draw an inference, if you find it reasonable to do so, concerning the defendant's motive to commit the crimes charged. You may consider this evidence for this purpose only. You are expressly prohibited from using this evidence as evidence of the bad character of the defendant or as evidence of a tendency to commit criminal acts.

"If you find this evidence credible, you may consider it for the sole and limited purpose of assisting you in determining motive. You are not permitted to consider this evidence for any other purpose, and as to the limited purpose, you must weigh such evidence as you do all other evidence in this case and consider it in the light of all the instructions I am giving you."

introduced into the Island Brothers, because of the victim's involvement in the shooting death of another Island Brothers member. "Although motive is not an element of any of the crimes with which the defendant had been charged, [w]e previously have recognized the significance that proof of motive may have in a criminal case. . . . [S]uch evidence is both desirable and important. . . . It strengthens the state's case when adequate motive can be shown. . . . Evidence tending to show the existence or nonexistence of motive often forms an important factor in the inquiry as to the guilt or innocence of the defendant. . . . This factor is to be weighed by the jury along with the other evidence in the case." (Internal quotation marks omitted.) *State* v. *Peeler*, supra, 267 Conn. 636.

We also conclude that the court properly found that the probative value of Pelletier's testimony was not outweighed by any unfair prejudice. Although we are cognizant that evidence relating to gangs and gang activity may, in certain circumstances, improperly arouse the emotions of the jury, Pelletier's testimony did not present such a danger. In its instructions to the jury, the court carefully limited the use of Pelletier's testimony to the issue of motive. See footnote 5. The court also prohibited Pelletier from testifying about any drug activity involving the Island Brothers. The court also informed the jurors that they were "not to infer from that evidence that the defendant committed the crimes with which he [was] charged," but rather that Pelletier's testimony could be considered only to determine a possible motive. In the absence of evidence to the contrary, we presume that the jury properly followed the court's instructions. See *State* v. *Peeler*, supra, 267 Conn. 638. Accordingly, we conclude that the court did not abuse its discretion in admitting Pelletier's testimony.

B

The defendant claims that the court improperly permitted the state to introduce into evidence two photo-

graphs of him with members of the Island Brothers. We disagree.

The following facts are relevant to our resolution of the defendant's claim. The defendant testified and on cross-examination, the state asked if he was a member of the Island Brothers or if he had participated in gang activities or rituals. The defendant responded that he did not. The state then had two photographs marked for identification. The defendant then asked to be heard outside the jury's presence.

Outside the jury's presence, the defendant denied that he was depicted in the photographs giving an Island Brothers' hand sign. The state then offered the photographs as full exhibits. The court allowed the photographs into evidence, finding that their probative value outweighed any potential prejudice.

We conclude that the photographs were relevant. The photographs were admitted to impeach the defendant's denial of membership in the Island Brothers. The photographs depicted the defendant, wearing a bulletproof vest, along with some individuals with Island Brothers tattoos, making the hand sign that members of the Island Brothers used to signify their membership in the gang.

We also conclude that the probative value of the photographs was not outweighed by any unfair prejudice. We reject the defendant's claim that the "effect of the [photographs] was to emphasize guilt by association with gang members . . . ." The court took effective steps to guard against a verdict based on guilt by association. The court repeatedly charged the jury that it could not convict the defendant because he was a member of the Island Brothers, but only for the crimes of which he was charged. Before final arguments, and again during its instructions, the court instructed the jury: "There is no such thing as a prosecution for belonging to an

association. The only prosecutions there can be are prosecutions for crimes or alleged crimes." We conclude that the basis for the defendant's conviction was not that he was a member of the Island Brothers. See *State* v. *Torres*, 47 Conn. App. 149, 159, 702 A.2d 142 (1997), cert. denied, 243 Conn. 963, 707 A.2d 1267 (1998).

C

The defendant next claims that the court abused its discretion when it permitted the state to elicit testimony that there was a second trial ongoing that involved other members of the Island Brothers. We disagree.

The following facts are relevant to our resolution of the defendant's claim. On November 9, 2002, as the defendant was testifying, the state sought to introduce into evidence the two photographs. Outside of the jury's presence, the state asked the defendant if he knew where or when the photographs were taken. In response, the defendant stated: "Why don't you go downstairs and ask [senior assistant state's attorney James G.] Clark." Clark was prosecuting a case at the time in the New Haven courthouse involving other members of the Island Brothers.

With the jury present, the state asked the defendant if he knew when the photographs were taken, to which the defendant responded that they were taken in 1995 or 1996. The state then asked the defendant: "And isn't it true when I first asked you . . . when those photographs were taken, you told me to ask prosecutor Clark?" The state then asked the defendant how he knew Clark, and the defendant responded that Clark was then prosecuting a case involving members of the Island Brothers in which Pelletier may have been a witness.

When court resumed on November 13, 2000, the defendant sought to strike that testimony, claiming that

it "imported evidence from another courtroom into this courtroom." In denying the motion, the court stated that it might have agreed that the line of questioning was prejudicial if that was the first time the jury heard about the Island Brothers. The court, however, stated that "significant evidence" already had been introduced concerning the Island Brothers and the individuals who may have been associated with them. The court did state that it intended to give the jury a limiting instruction. When the jury returned, the court instructed the jury as follows: "You may recall during cross-examination . . . there were some questions directed at [the defendant] in which there was some reference to an Island Brothers prosecution. I am going to give you a limiting instruction, and the instruction is as follows: There is no such thing as a prosecution for belonging to an association. The only prosecutions there can be are prosecutions for crimes or alleged crimes."

It is the defendant's contention on appeal that "the state imported into this case evidence of minimal probative value from another prosecution which created undue risk of inflaming the jury's fear of gangs." On cross-examination, the defendant denied being associated with the Island Brothers. When confronted with the two photographs, the defendant stated that he knew that those photographs involved Clark, who then was prosecuting other members of the Island Brothers in the same courthouse. We conclude that the defendant's knowledge of the evidence in that prosecution was relevant to impeach him.

Even if we were to agree with the defendant's claim that the court improperly permitted the state to introduce evidence relating to another prosecution, the defendant is not entitled to a new trial. "Under the current and long-standing state of the law in Connecticut, the burden to prove the harmfulness of an improper evidentiary ruling is borne by the defendant. The defen-

dant must show that it is more probable than not that the erroneous action of the court affected the result. . . . The question is whether the trial court's error was so prejudicial as to deprive the defendant of a fair trial, or, stated another way, was the court's ruling, though erroneous, likely to affect the result?" (Citations omitted; internal quotation marks omitted.) *State* v. *Booth*, 250 Conn. 611, 638, 737 A.2d 404 (1999), cert. denied sub nom. *Brown* v. *Connecticut*, 529 U.S. 1060, 120 S. Ct. 1568, 146 L. Ed. 2d 471 (2000). The defendant has not established that the challenged line of questioning affected the outcome of his trial. Although the defendant claims that the evidence demonstrated "the larger scope of the Island Brothers prosecution undertaken by . . . Clark and Pelletier," the court repeatedly instructed the jury that "[t]here is no such thing as a prosecution for belonging to an association." See *State* v. *Torres*, supra, 47 Conn. App. 159.

Furthermore, any prejudice suffered by the defendant was diminished by the fact that the jury already had before it significant evidence that he was a member of the Island Brothers. Pelletier testified that the defendant had told him that he was a member of the Island Brothers, and Pelletier also testified that he had seen the defendant give the identifying Island Brothers' hand signal. In light of that evidence and the photographs before the jury, the admission of the challenged line of questioning, even if it was improper, does not require a new trial.

IV

The defendant claims that the court, *Lager*, *J.*, improperly permitted the state to admit into evidence the prior testimony of George David Wright. The defendant claims that his sixth amendment right of confrontation was violated by the admission of Wright's probable cause hearing testimony because (1) the attorney who

represented the defendant during that hearing was later disqualified after the court was informed that he suffered from a conflict of interest and (2) certain evidence was not available to the defendant at the time of the hearing.[6] We disagree.

The following facts and procedural history are relevant to our resolution of that claim. Out of the presence of the jury, the state called Wright to testify. Wright's attorney accompanied him to the witness stand. The state asked Wright if he knew the victim. Wright did not respond to the question. Wright's attorney informed the court that it was his client's position that he would not testify. The state asked several other questions of Wright, and Wright refused to respond. When asked if he would follow the court's order to testify, Wright stated that he would not, no matter what the court did. The court then excused Wright.

The state sought to introduce Wright's testimony from January 16, 1998, at the defendant's first probable cause hearing. The state argued that the transcript was admissible because Wright was legally unavailable and that the transcript revealed that the defendant's attorney at the time, Dolan, subjected Wright to a complete and thorough cross-examination. The defendant objected to the admission of the transcript, arguing that it was inadmissible because his attorney at the probable cause hearing was subsequently disqualified because he suffered from a conflict of interest, undermining the entire probable cause hearing. The defendant also argued that subsequent to the January, 1998 probable cause hearing, Tacuma Grear provided a statement to the police. That, the defendant claims, prevented his attorney from cross-examining Wright as to that statement.

---

[6] The defendant does not invoke the Connecticut constitution.

The court overruled the defendant's objection and permitted the state to introduce into evidence Wright's prior testimony. The court made a finding that Wright was unavailable to testify pursuant to § 8-6 of the Connecticut Code of Evidence. The court then held, relying on the decision of the United States Court of Appeals for the Second Circuit in *United States* v. *Ciak*, 102 F.3d 38 (2d Cir. 1996), that Dolan's subsequent disqualification did not render inadmissible Wright's testimony from the defendant's first probable cause hearing. In doing so, the court found that Dolan had conducted an extremely vigorous cross-examination of Wright and concluded that there was a significant indicia of reliability in Wright's prior probable cause hearing testimony.

Wright had testified at the probable cause hearing that he saw someone fire gunshots from a .45 caliber semiautomatic pistol into the Jeep in which the victim was sitting. As that person walked away, Wright recognized the defendant's limp. Wright had known the defendant for eight years. Wright also saw that that person was dressed in the same clothes Wright had seen the defendant wearing approximately twenty minutes before the shooting. Wright testified that he told the police two days after the shooting that he was sure that it was the defendant who had shot the victim.

After Wright's prior testimony was read, the court informed the jury that it was permitted to consider Wright's testimony substantively, but that it was up to the jury what, if any, weight it would give to the testimony.

"It is well established that a defendant has the right to confront witnesses against him as guaranteed by the confrontation clauses of both our federal and state constitutions. . . . [T]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations.

The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process. . . . The United States Supreme Court has recognized that competing interests may warrant dispensing with confrontation at trial. . . .

"Cases involving the admission of an unavailable declarant's prior statements . . . [give] rise to Confrontation Clause issues because hearsay evidence was admitted as substantive evidence against the [defendant]. . . . The sixth amendment to the United States constitution guarantees that [in] all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Henry*, 76 Conn. App. 515, 530–31, 820 A.2d 1076, cert. denied, 264 Conn. 908, 826 A.2d 178 (2003).

In *Crawford* v. *Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the United States Supreme Court overruled the rule it established in *Ohio* v. *Roberts*, 448 U.S. 56, 66, 100 S. Ct. 2531, 65 L. Ed. 2d 597 (1980), for the admissibility of testimonial statements of witnesses absent from trial.[7] Recognizing that "[r]eliability is an amorphous, if not entirely subjective concept"; *Crawford* v. *Washington*, supra, 63; and that "reliability [must] be assessed in a particular manner: by testing in the crucible of cross-examination"; id., 61; the Supreme Court held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." Id., 68.

---

[7] "In *Ohio* v. *Roberts*, [supra, 448 U.S. 66], the United States Supreme Court announced a two part test for determining whether former testimony may be admitted without infringing on a criminal defendant's right of confrontation. That test requires (1) demonstration that the witness is unavailable to testify at trial, and (2) adequate indicia of reliability of the previous testimony." (Internal quotation marks omitted.) *State* v. *Bryant*, 71 Conn. App. 488, 492, 802 A.2d 224, cert. denied, 261 Conn. 939, 808 A.2d 1133 (2002).

A

Wright testified on January 16, 1998, at the defendant's first probable cause hearing, which had began on December 23, 1997. At that time, the defendant was represented by Dolan, and Dolan represented a witness, Tacuma Grear, as well. The defendant claims that Wright's testimony at the January, 1998 probable cause hearing did not have an adequate indicia of reliability because his then counsel, Dolan, suffered from a conflict of interest. We address that claim in terms of a prior opportunity for cross-examination. See id., 36.

The trial court's resolution of the defendant's claim was guided by the Second Circuit's decision in *United States* v. *Ciak*, supra, 102 F.3d 38. In *Ciak* v. *United States*, 59 F.3d 296, 306 (2d Cir. 1995), the Second Circuit had concluded that Scott Ciak's trial counsel's ongoing relationship with two key government witnesses, Kristine Ciak and Michael Reed, created a conflict of interest. Scott Ciak's conviction was then reversed. Id., 307. At Scott Ciak's second trial, the government introduced into evidence the transcript of the testimony from the first trial of another witness, Steven Reed, who had died prior to the second trial. *United States* v. *Ciak*, supra, 41. Scott Ciak was subsequently convicted. Id.

On appeal, Scott Ciak claimed that the District Court had violated his rights under the sixth amendment to the United States constitution by permitting the government to introduce into evidence Steven Reed's testimony from the first trial after it was determined that he had received conflicted representation at that trial. Id., 43. The Second Circuit refused to adopt a per se rule that an attorney's cross-examination from a prior court proceeding is inadequate when it is subsequently determined that the attorney suffered from a conflict of interest at the time of the cross-examination in the earlier proceeding. Id., 44. Rather, the Second Circuit

examined the transcript of Steven Reed's testimony to determine whether the cross-examination "imbues the testimony with the requisite indicia of reliability." (Internal quotation marks omitted.) Id. After reviewing the transcript, the court concluded that Scott Ciak's trial counsel's cross-examination of Steven Reed was constitutionally adequate, finding that his counsel had made a "serious effort" to undermine and to discredit Steven Reed's testimony. Id.

In *State* v. *Joyner*, 255 Conn. 477, 494, 774 A.2d 927 (2001), our Supreme Court followed the Second Circuit's decision in *Ciak* and refused to adopt a per se rule against admitting into evidence the prior testimony of a witness who had been cross-examined by a conflicted counsel. Our Supreme Court observed that an independent evaluation of the adequacy of that cross-examination was not barred by a finding of a conflict of interest. Id. Our Supreme Court ordered the trial court to evaluate independently the reliability of the prior testimony to determine the admissibility of that witness' prior testimony in a subsequent trial. Id., 498.

Our review of Dolan's cross-examination of Wright supports the trial court's admission of Wright's testimony from the defendant's first probable cause hearing. Dolan elicited through cross-examination that Wright was a convicted felon and that the state had promised him that it would not charge him with having been in possession of the stolen Jeep in which the victim was shot. Dolan also elicited that Wright never saw the face of the perpetrator. Dolan also questioned Wright's testimony as to how he could see that the firearm used in the shooting was a .45 caliber 4606, but could not see any flashes from the gun when it was fired. Dolan brought out that when Wright first spoke with the police about the incident, he told them that he was not at the scene at the time of the shooting and that Wright had run out of his sister's house after the shooting to find

the victim shot in the vehicle, a scenario different from Wright's testimony at the probable cause hearing. Dolan also explored inconsistencies between Wright's testimony and his initial statement to the police, as well as his criminal record. See *United States* v. *Ciak*, supra, 102 F.3d 44.

No restrictions were placed on Dolan's ability to cross-examine Wright at the probable cause hearing. See *State* v. *Bryant*, 71 Conn. App. 488, 493–94, 802 A.2d 224, cert. denied, 261 Conn. 939, 808 A.2d 1133 (2002). Wright's probable cause hearing testimony was given under oath, subject to criminal penalties for perjury, before a court that kept an accurate record of the proceeding, and the defendant was present and represented by counsel who made serious efforts to discredit Wright. See *United States* v. *Ciak*, supra, 102 F.3d 44; *State* v. *Munoz*, 233 Conn. 106, 137, 659 A.2d 683 (1995). Wright was not involved in Dolan's conflict of interest. Thus, the conflict in Dolan's representation of the defendant did not extend to Dolan's cross-examination of Wright. See *United States* v. *Ciak*, supra, 44. Accordingly, we conclude that Dolan had a more than adequate and full opportunity to cross-examine Wright, and that the defendant's sixth amendment rights were not violated when the court permitted the state to introduce into evidence Wright's prior testimony.

B

The defendant next claims that the court improperly permitted the state to introduce into evidence Wright's prior testimony because subsequent to the probable cause hearing, Tacuma Grear gave a statement to the police that could have been used to question the veracity of Wright's testimony. We disagree.

Wright testified at the defendant's first probable cause hearing on January 16, 1998. On June 18, 1998, Grear gave a written statement to the police. It is the

defendant's contention that had he had Grear's statement to the police at the time Wright testified, the statement could have been used to impeach Wright.

It is difficult to see how the defendant was harmed. Tacuma Grear testified at the trial and stated that his June 18, 1998 statement, which was admitted into evidence, was the truth. That could have served as a basis for defense counsel, if he wanted to do so, to point out in summation how Grear's statement undermined Wright's testimony. Furthermore, in his brief, the defendant does not cite anything in Grear's statement that would support his claim.[8] Finally, the jury had Grear's statement to compare with Wright's statement during deliberations.

V

The defendant next claims that his constitutional right to confront the witnesses against him was violated when the court permitted the state to introduce into evidence the testimony of Travis Jenkins from the defendant's first trial, which resulted in a mistrial. The defendant claims that it was improper for the court to admit the transcript of Jenkins' testimony into evidence because during that testimony, the state introduced Jenkins' prior inconsistent statement under *State* v. *Whelan*, 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). It is the defendant's contention, relying on our Supreme Court's decision in *State* v. *Williams*, 231 Conn. 235, 247–50, 645 A.2d 999 (1994), that the *Whelan* statement contained in the transcript was inadmissible because Jenkins did not testify in the present trial and was not subject to cross-examination.

---

[8] Although the defendant argued to the trial court that he could have used Grear's statement to challenge Wright's testimony about where people were standing at the time of the shooting, the defendant's brief to this court is silent on how he intended to use any discrepancies between Grear's statement and Wright's testimony.

The following facts are relevant to our resolution of the defendant's claim. Outside of the presence of the jury, the state presented evidence that it had been unable to procure the attendance of Jenkins, for whom the court previously had issued a capias.[9] The defendant conceded that the state had established that Jenkins was unavailable to testify. The defendant then requested the opportunity to review Jenkins' testimony from his first trial because "I know there's some things that may bootstrap in. I might want to object to it."

The court made a finding that the state had established, pursuant to § 8-6 of the Connecticut Code of Evidence and the common law, that Jenkins was unavailable to testify. The court then admitted into evidence Jenkins' testimony from the defendant's first trial and permitted the defendant to preserve any objections he may have had as to the content of the testimony. After a recess in order to permit the defendant to review the transcript, the court asked the defendant if he had any comments on the substance of the transcript. The defendant replied: "No. There has been a little bit of objection and court orders, but it's not much. It's not so much so that it would inherently confuse the jury, I don't think." The court, after also reviewing the transcript, agreed, and then permitted the state to read Jenkins' trial testimony into evidence.

When the jury returned to the courtroom, the state read the transcript into evidence. In his testimony, Jenkins denied that he was at the scene at the time of the shooting. Jenkins admitted, however, that he had given a tape-recorded statement and a signed statement to the police on October 30, 1997, in which he stated that he saw the defendant shoot the victim. When cross-

[9] The state had a subpoena served on Jenkins, notified him of the time that he was expected to appear, had a capias issued when he failed to appear and searched for him to serve him the capias.

examined, Jenkins stated that he had provided the police with an untrue statement because he was threatened with being prosecuted for the victim's killing unless he did so.

The state subsequently rested its case on November 7, 2000. On November 8, 2000, while the defendant was presenting his case, the state informed the court that Jenkins was present. Outside of the jury's presence, Jenkins was brought before the court and informed that the subpoena that had been served was still in effect and that he would be arrested if he failed to report to court if he was called to testify within the next two days. Thereafter, first in chambers, and then on the record, the court sustained the defendant's objection to the state reopening its case and calling Jenkins to testify.

Before we address the defendant's claim, we must determine whether the defendant preserved the issue before the trial court. We conclude that he did not.

"Our rules of practice make it clear that counsel must object to a ruling of evidence [and] state the grounds upon which objection is made . . . to preserve the grounds for appeal. . . . These requirements are not simply formalities. . . . We consistently have stated that we will not consider evidentiary rulings where counsel did not properly preserve a claim of error by objection . . . ." (Internal quotation marks omitted.) *State* v. *Pereira*, 72 Conn. App. 107, 117–18, 806 A.2d 51 (2002), cert. denied, 262 Conn. 931, 815 A.2d 135 (2003).

The defendant never objected to the court's admitting Jenkins' testimony into evidence. The defendant agreed that Jenkins was unavailable to testify. In regard to the admission of the transcript itself, the defendant stated: "I would like . . . just a chance to review [the transcript] because I know there's some things that may bootstrap in. I *might* want to object to it." (Emphasis

added.) The court then gave the defendant an opportunity to review the transcript. After reviewing the transcript, the defendant did not object to the court's decision admitting the transcript into evidence. Accordingly, the claim was not preserved.

The defendant asks us to review his claim under *State v. Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We decline to do so.

Under *Golding*, "a defendant can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these conditions, the defendant's claim will fail." (Emphasis in original.) Id.

In *State v. Williams*, supra, 231 Conn. 250, our Supreme Court held that it was improper, under *State v. Whelan*, supra, 200 Conn. 743, to admit into evidence the prior inconsistent statement of an individual who had been a witness in a prior proceeding where the declarant was not a witness in the trial in which the statement was admitted under *Whelan*. Our Supreme Court in *Williams*, however, stated that this was a harmless "evidentiary error." *State v. Williams*, supra, 250. The court stated: "If a claim on appeal is nonconstitutional in nature, the burden of establishing that the error was harmful is on the appellant." Id. Since the second prong of *Golding* requires that the claim to be reviewed be of "constitutional magnitude alleging the violation of a fundamental right"; *State v. Golding*,

supra, 213 Conn. 239; we conclude that the defendant's claim fails under *Golding*.[10]

Moreover, we conclude that the defendant could have confronted and cross-examined Jenkins at the time the state wanted to call him to testify after it had rested its case, but, by successfully objecting, gave up that opportunity. The defendant now seeks a new trial because he did not cross-examine Jenkins. We would disagree. Our rules of procedure do not allow a defendant to pursue one course of action at trial and later, on appeal, argue that a path he rejected should be open to him. *State* v. *Reynolds*, 264 Conn. 1, 207, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); see *State* v. *Arluk*, 75 Conn. App. 181, 192, 815 A.2d 694 (2003); *State* v. *Cooper*, 38 Conn. App. 661, 667, 664 A.2d 773, cert. denied, 235 Conn. 908, 665 A.2d 903 (1995), cert. denied, 517 U.S. 1214, 116 S. Ct. 1837, 134 L. Ed. 2d 940 (1996).

VI

The defendant's final claim is that prosecutorial misconduct during summation violated the presumption of innocence, the right to the assistance of counsel and the right to a fair trial. The defendant failed to preserve his claims of prosecutorial misconduct at trial and seeks review under *State* v. *Golding*, supra, 213 Conn. 239–40. In *State* v. *Stevenson*, 269 Conn. 563, 572–73, 849 A.2d 626 (2004), our Supreme Court held that it was "unnecessary for the defendant to seek to prevail under the specific requirements of [*Golding*] . . . and, similarly, it [was] unnecessary for a reviewing court to apply the

---

[10] For the first time, in his reply brief, the defendant claims that it was plain error for the court to admit Jenkins' prior testimony into evidence. "[I]t is a well established principle that arguments cannot be raised for the first time in a reply brief." (Internal quotation marks omitted.) *State* v. *Morales*, 78 Conn. App. 25, 36, 826 A.2d 217, cert. denied, 266 Conn. 901, 832 A.2d 67 (2003). We therefore decline to review the defendant's claim that the court's ruling was plain error.

four-prong *Golding* test. The reason for this is that the touchstone for appellate review of claims of prosecutorial misconduct is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set out by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). As we stated in that case: In determining whether prosecutorial misconduct was so serious as to amount to a denial of due process, this court, in conformity with courts in other jurisdictions, has focused on several factors. Among them are the extent to which the misconduct was invited by defense counsel or argument . . . the severity of the misconduct . . . the frequency of the misconduct . . . the centrality of the misconduct to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citation omitted; internal quotation marks omitted.) Accordingly, we will review the defendant's claims of prosecutorial misconduct to determine if he was denied a fair trial.

"Because the inquiry must involve the entire trial, all incidents of misconduct must be viewed in relation to one another and within the context of the entire trial. The object of inquiry before a reviewing court in claims involving prosecutorial misconduct, therefore, is always and only the fairness of the entire trial, and not the specific incidents of misconduct themselves." *State* v. *Stevenson*, supra, 269 Conn. 574.

"Prior to analyzing the defendant's specific claims of prosecutorial misconduct, we set forth the well established principles that guide our inquiry as to all of his claims. To prove prosecutorial misconduct, the defendant must demonstrate substantial prejudice. . . . In order to demonstrate this, the defendant must establish that the trial as a whole was fundamentally unfair and that the misconduct so infected the trial with unfairness

as to make the conviction a denial of due process. . . . [I]t is not the prosecutor's conduct alone that guides our inquiry, but, rather, the fairness of the trial as a whole." (Citation omitted; internal quotation marks omitted.) *State* v. *Coney*, 266 Conn. 787, 806–807, 835 A.2d 977 (2003).

"Moreover, in analyzing claims of prosecutorial misconduct, we engage in a two step analytical process. The two steps are separate and distinct: (1) whether misconduct occurred in the first instance; and (2) whether that misconduct deprived a defendant of his due process right to a fair trial." (Internal quotation marks omitted.) Id., 808.

"As we previously have recognized, prosecutorial misconduct of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such misconduct has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . . This heightened duty derives from our long recognition of the special role played by the state's attorney in a criminal trial. He is not only an officer of the court, like every attorney, but is also a high public officer, repre-

senting the people of the State, who seek impartial justice for the guilty as much as for the innocent. In discharging his most important duties, he deserves and receives in peculiar degree the support of the court and the respect of the citizens of the county. By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty are at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused be guilty, he should none the less be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury have no right to consider." (Citation omitted; internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 458–59, 832 A.2d 626 (2003).

"Just as the prosecutor's remarks must be gauged in the context of the entire trial, once a series of serious improprieties has been identified we must determine whether the totality of the improprieties leads to the conclusion that the defendant was deprived of a fair trial. . . . Thus, the question . . . is whether the sum total of [the assistant state's attorney's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial misconduct, therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . Furthermore, whether a new trial or proceeding is warranted depends, in part, on

whether defense counsel has made a timely objection to any of the prosecutor's improper remarks." (Citations omitted; internal quotation marks omitted.) Id., 460.

"We emphasize the responsibility of defense counsel, at the very least, to object to perceived prosecutorial improprieties as they occur at trial, and we continue to adhere to the well established maxim that defense counsel's failure to object to the prosecutor's argument when it was made suggests that defense counsel did not believe that it was unfair in light of the record of the case at the time. . . . Accordingly, we emphasize that counsel's failure to object at trial, while not by itself *fatal* to a defendant's claim, frequently will indicate on appellate review that the challenged comments do not rise to the magnitude of constitutional error . . . . Put differently . . . prosecutorial misconduct claims [are] not intended to provide an avenue for the tactical sandbagging of our trial courts, but rather, to address gross prosecutorial improprieties that . . . have deprived a criminal defendant of his right to a fair trial. . . .

"We begin our analysis in the present case, therefore, by first determining whether the assistant state's attorney's conduct constituted prosecutorial misconduct." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 576.

A

The defendant claims that his right to remain silent was improperly burdened by the argument of the assistant state's attorney. The defendant takes issue with two comments by the assistant state's attorney: (1) "[The defendant's] story was told smoothly. But it should be; he had three years to practice it. Remember on November 3, 1997, he wouldn't even tell the police who his alibi witnesses were, who was there," and (2) "But unlike George David Wright, who went back with Mrs.

Price to the police station and told Detective [Frank] Roberts, he named the names and told the story with the names in it. [The defendant] never went forward. There's no evidence he ever went forward in that Corey Grear investigation to tell what he knew, supposedly really knew."

The defendant quotes the Massachusetts Supreme Judicial Court in *Commonwealth* v. *Person*, 400 Mass. 136, 140, 508 N.E.2d 88 (1987), which stated that a "prosecutor may not argue that the jury should draw a negative inference from the fact that the defendant remained silent until he testified." *Person* cites *Doyle* v. *Ohio*, 426 U.S. 610, 96 S. Ct. 2240, 49 L. Ed. 2d 91 (1976), as authority for that proposition. *Doyle* condemned adverse references to a suspect's silence after the suspect is given the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), and the defendant does not argue that that circumstance arose in this case.[11] The defendant's brief does not set forth any facts or the application of *Doyle* to the facts of this case. The defendant merely quotes from *Person* and refers to *Grunewald* v. *United States*, 353 U.S. 391, 425–26, 77 S. Ct. 963, 1 L. Ed. 2d 931 (1957) (Black, J., concurring), which predates *Doyle*, for the proposition that his constitutional rights may not be burdened impermissibly. The defendant, thus, has provided us with no facts or analysis to support his claim. Accordingly, we decline to review the defendant's claim.

"[F]or this court judiciously and efficiently to consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their

---

[11] We note that our Supreme Court has held that selective silence after *Miranda* warnings does not violate *Doyle*. See *State* v. *Talton*, 197 Conn. 280, 295, 497 A.2d 35 (1985). Further, *Doyle* allows reference to a defendant's silence to refute a defendant's claim that he cooperated with the police in their investigation. *Doyle* v. *Ohio*, supra, 426 U.S. 619 n.11.

briefs. We do not reverse the judgment of a trial court on the basis of challenges to its rulings that have not been adequately briefed. . . . The parties may not merely cite a legal principle without analyzing the relationship between the facts of the case and the law cited. . . . [A]ssignments of error which are merely mentioned but not briefed beyond a statement of the claim will be deemed abandoned and will not be reviewed by this court." (Internal quotation marks omitted.) *Giulietti* v. *Giulietti*, 65 Conn. App. 813, 840–41, 784 A.2d 905, cert. denied, 258 Conn. 946, 947, 788 A.2d 95, 96, 97 (2001).

B

The defendant claims there was misconduct because of a number of comments made by the assistant state's attorney. We will address only those comments that are addressed and analyzed in the defendant's brief. Those comments fall into three categories: (1) comments that the jury had a duty to convict the defendant, (2) comments concerning the fear of the witnesses who testified and (3) comments about the police.

1

The defendant claims that the assistant state's attorney improperly told the jury that it had a duty to convict.

In support of his argument, the defendant relies on our Supreme Court's decision in *State* v. *Whipper*, 258 Conn. 229, 271–72, 780 A.2d 53 (2001). In *Whipper*, our Supreme Court held that it was improper for a prosecutor to argue to the jury that it had a duty to convict the defendant. Id., 271.

The defendant claims that the assistant state's attorney told the jury that it had a duty to convict when he stated: "And your verdict is not only important to the parties in this case, but your verdict is important to our entire system of justice and for the protection of our

society. I want to thank you at this point for carrying out that important duty." That comment came at the beginning of the closing argument of the assistant state's attorney before he began to summarize the state's case. The comment merely thanked the jury for performing its function. At no point did the assistant state's attorney tell the jury that it had a duty to convict the defendant, nor can the comment be interpreted reasonably to imply such a statement. We conclude that the comment was not improper.

The defendant also claims that the comment by the assistant state's attorney that "[you should convict] because the state has shown through its evidence that these are the only verdicts that the evidence in this case supports and that fairness demands, and in reaching such a verdict justice will be served." The defendant inserted the bracketed language, however, which does not appear in the transcript. The transcript reflects that the assistant state's attorney told the jury in closing argument: "[T]he state asks each and every one of you to, collectively as a jury, return verdicts of guilty on murder and criminal possession of a firearm because the state has shown through its evidence that these are the only verdicts that the evidence in this case supports and that fairness demands, and in reaching such a verdict justice will be served." Those comments, which came at the conclusion of the assistant state's attorney's closing argument summarizing the evidence, asked the jury to convict the defendant on the basis of the evidence presented. We conclude that the comments were not improper.

2

The defendant claims that the comments by the assistant state's attorney about the fear of certain witnesses were improper because they asked the jury to speculate

and were not supported by the evidence.[12] We recognize that "a prosecutor may argue the state's case forcefully, [but] such argument must be fair and *based upon the facts in evidence and the reasonable inferences to be drawn therefrom.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 394, 832 A.2d 14 (2003).

The comments by assistant state's attorney about the fear of certain witnesses were based on the evidence.

[12] The defendant cites a series of comments that he claims were improper:

"This type of crime would strike fear into anybody—anybody's heart, and because of this crime, [the victim's] family will never see him again. . . .

"I believe after sitting through this entire case, you can all well imagine how tough it is for a fellow Island Brother to come into court and testify in front of the defendant, who's an Island Brother. Obviously, [Tacuma Grear is] going to back off. . . . And we all know about what it would be like to be a snitch in jail. When I confronted [Tacuma Grear] with that question, he's saying, 'Well, I'm doing all right' . . . .

"But again, [Jenkins] backed down when he came into court in front of the defendant. . . .

"Well, after an incident where you witness the defendant shoot somebody in cold blood, you can understand how easy it would be to tell the police what happened in the privacy of the police station. You can understand how it's quite different sitting up there on that [witness] stand having to face this particular defendant. . . .

"Many of the witnesses you saw testify for the state are or were in jail when they testified, and you can understand what it is and means to be a snitch in jail. None of us probably have ever been in a situation like that, so I'm asking you to think how it would be to be with gang members in jail, be with gang members on the street and be in court snitching in front of the defendant. . . .

"[The] [c]ommon theme throughout this trial is fear. We heard from Kathy Wright . . . . [S]he hid her children, she was so afraid. . . . Tacuma Grear talked about being somewhat afraid of the streets. . . . You could well imagine his situation. I asked him, 'What's it like to be a snitch in prison?' He's in prison. He goes, 'Well, I've been doing all right so far.' Then there was Travis Jenkins. He stated, 'A snitch is not a good thing' . . . . I said, 'You wouldn't want to snitch on somebody?' He goes, 'No, I wouldn't want to snitch on the defendant' . . . . Albert Jenkins testified from the [witness] stand [that] he wouldn't want to snitch on his good friend, [the defendant]. It's clear what is happening here. . . . It's clear to understand how and why they would back off. I ask you never to underestimate the power that fear has over people.

The retribution murder of the victim because of the murder of Corey Grear, the use of assault and murder to enforce the rules of the Island Brothers, and the fact that a witness disobeyed court orders rather than testify, combined with the specific testimony that Kathy Wright was threatened by the defendant[13] and Tacuma Grear's observation that it was not good to be an informant in prison, supported the remarks of the assistant state's attorney.

Furthermore, during closing argument, defense counsel stated that he agreed with the assistant state's attorney about "the unvarnished truth" concerning street life in the "Island" projects, where, as the defendant had testified, it was not unusual to hear gunshots fired and to see people carrying guns. Defense counsel further stated that "within that environment, we have to understand the facts of this case." We conclude that the comments by the assistant state's attorney were based on the evidence and were not improper.

### 3

The defendant also claims that the comments by the assistant state's attorney about the police "assured the jury he knew the police were correct" and vouched for their credibility as witnesses.

The defendant claims that it was improper for the assistant state's attorney to comment that "the police aren't speculating, they are basing their investigation based on the facts and the statements from witnesses," and "[the police] can't threaten. They wouldn't threaten.

---

"You heard about the Island Brothers' presence in the projects. You heard about the anonymous complaints by citizens. Could you imagine having to live out there? Imagine having your home there like Kathy Wright. Do you think anyone is going to want to come back in court and tell on an Island Brother, knowing [that] eventually, you have to go back?"

[13] Two days after the shooting, Kathy Wright, the victim's girlfriend, gave a statement to the New Haven police and shortly thereafter, the defendant threatened her because of that statement.

They never testified . . . that they threatened people." Those statements should be read in context.

In each instance, the comments were in direct response to comments made by defense counsel during his closing argument. During the defendant's closing argument, his counsel argued that Tacuma Grear was present and had a motive to kill the victim. In response, the assistant state's attorney told the jury: "[Defense counsel] makes a point, which is true. Tacuma Grear had a motive to kill [the victim]. It was his brother who was killed. There's no evidence that the police had to show his involvement in it. We could all speculate that he probably knew something was going on, especially since he never turned back around while he's frisking George David Wright, but there's no hard evidence. If the police were going to just pick someone, why not pick him, the guy whose brother it is? Because the police aren't speculating, they are basing their investigation based on the facts and the statements from witnesses." Nowhere did the assistant state's attorney vouch for the credibility of the police officers that testified at trial.

During the defendant's closing argument, his counsel also made repeated comments about alleged police impropriety. Defense counsel stated: "[The police] also threaten potential witnesses. This is okay, this is something that they've studied and this is something that they do . . . ." In response, the assistant state's attorney told the jury: "There is no question [the police] are . . . allowed to lie to people they are questioning. They are allowed to say so and so said this about you; there's no question about that, that was testified to. Then [defense counsel] in his closing says . . . they also can threaten. They can't threaten. They wouldn't threaten. They don't threaten for charges if they don't have anything to back it up. They'd lose all credibility. That was never testified to. They never testified, as [defense

counsel] would have you believe, that they threatened people."

The comments by the assistant state's attorney were in direct response to defense counsel's comments. In those circumstances, it was proper for the assistant state's attorney to respond as he did. In doing so, the assistant state's attorney in no way vouched for the credibility of the police officers. The remarks were not improper.

C

The defendant claims that the comments by the assistant state's attorney during closing argument violated the sixth amendment right to the assistance of counsel. The defendant argues that the comments attacked his prior counsel for performing the functions of an attorney and impugned the role of defense counsel.

The defendant claims that the assistant state's attorney impaired the right to counsel by stating during rebuttal argument to the jury: "Another common theme in this case is attorney Michael Dolan, it's very interesting. . . . Things change when attorney Michael Dolan, representing [the defendant] and the state's principal witness at the same time, things changed with [Tacuma] Grear. Also . . . Linwood Stevenson went down to attorney Michael Dolan's office on December 23, 1997, where all of a sudden he could identify the shooter and can clearly make him so short that he can't be [the defendant], down at attorney Michael Dolan's where I also believe Travis Jenkins was there as well. Many of the witnesses from the defense, almost all of them, were at one time or another represented by attorney Michael Dolan. You talk about the police. [Defense counsel] would like you to believe the police made these threats of conspiracy. If you want to talk about a conspiracy, what's going down on . . . at attorney Michael Dolan's office? People give one statement to

the police, all of a sudden they are all together at his office. All the police interviews were separate as you heard, and they are all changing their story in favor of Mr. Dolan's client, [the defendant]." Similarly, the defendant claims that the assistant state's attorney improperly commented that the credibility of Stevenson,[14] James Benson[15] and Chris Hudson[16] was affected by their contact with Dolan.

We recognize that "[t]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel." (Internal quotation marks omitted.) *State* v. *Rogelstad*, 73 Conn. App. 17, 31, 806 A.2d 1089 (2002).

The comments by the assistant state's attorney did not attack the defendant for consulting an attorney, nor did they attack his trial counsel for performing the functions of an attorney. Trial counsel's integrity as a defense counsel was not denigrated in any manner. What the assistant state's attorney referred to as a conspiracy was a gathering of witnesses at attorney Dolan's

[14] The assistant state's attorney previously had told the jury: "Now, Linwood Stevenson, all of a sudden, he goes to attorney Michael Dolan's office, and he says the shooter is around four foot, nine [inches tall], maybe a little taller. Nowhere in his statement did it ever talk about Mr. Linwood Stevenson seeing [the defendant] standing by the Jeep. Nowhere in the statement did he talk about talking to his cousin, who supposedly was the chief of homicide over at New Haven. Yet, he signed that statement, said he read it and [that] everything was true to the best of his knowledge. The statement wasn't taped over at attorney Michael Dolan's. As a matter of fact, none of these statements that the defense witnesses gave when they did give statements were ever on tape."

[15] The assistant state's attorney stated: "You heard from James Benson. He was in prison. He, too, had connection to attorney Michael Dolan. He was represented by attorney Michael Dolan at one point."

[16] The assistant state's attorney stated: "Supposedly, [Hudson] has information that [the defendant] could not have been at the scene of the shooting. So, what does [Hudson] do with the information? . . . He never went down to the police station to say that [the defendant] wasn't there. . . . He didn't testify last year. . . . Something is wrong; it's odd how he just appears here in November of 2000. Where was he for the last three years?"

office, at which time Tacuma Grear and Linwood Stevenson changed their stories. The comments, when read in context, were an attempt by the assistant state's attorney to point out the evidence surrounding the changes from the prior police statements of an eyewitness and that a witness came forward long after the shooting. See *State* v. *Thompson*, supra, 266 Conn. 468 n.16.

It is not claimed that the comments by the assistant state's attorney were not grounded in the evidence adduced at trial. A prosecutor "may comment on the credibility of the witness as long as the comment reflects reasonable inferences from the evidence adduced at trial." (Internal quotation marks omitted.) *State* v. *Dupigney*, 78 Conn. App. 111, 124, 826 A.2d 241, cert. denied, 266 Conn. 919, 837 A.2d 801 (2003).

The comments, moreover, concerned the defendant's former counsel. The evidence showed that Dolan had represented many of the defense witnesses in the past and, in the case of Tacuma Grear, that Dolan did so when Grear testified at the defendant's first probable cause hearing. We conclude that it was not improper to ask the jury to consider what effect Dolan's relationship would have on the witness' testimony. With respect to the comments concerning Dolan's obtaining a statement from Stevenson, Stevenson did come forward two months after the shooting to describe the killer as a man too short to be the defendant. On the evening of the shooting, Stevenson did not volunteer to the police who interviewed him a description of the person who shot the victim. The argument that Stevenson suddenly came forward two months after the shooting to describe the killer as a man too short to be the defendant was supported by the evidence.

There was, however, no evidence that Dolan had ever represented Stevenson, and the reference to Stevenson

in the midst of discussing the relationship of the other witnesses who were clients of Dolan was improper. It also was improper for the assistant state's attorney to suggest, even obliquely, that Dolan had engaged in a conspiracy with the witnesses who met in his office, as Dolan had the right and the duty to investigate and to interview witnesses. We do not, however, find that the comments violated the defendant's due process rights to a fair trial. Those comments appear to be spontaneous, confused and disjointed. We also do not find that the conduct of the assistant state's attorney was repeatedly improper. The improper comments were not frequent. See *State* v. *Stevenson*, supra, 269 Conn. 593–94 (only two of seven instances of alleged misconduct were improper). Moreover, the defendant did not object to any of the comments by the assistant state's attorney or ask for a curative instruction. "[T]he fact that defense counsel did not object to one or more incidents of misconduct must be considered in determining whether and to what extent the misconduct contributed to depriving the defendant of a fair trial and whether, therefore, reversal is warranted." Id., 576. "[C]ounsel's failure to object at trial, while not by itself *fatal* to [the] defendant's claim, frequently will indicate on appellate review that the challenged [comments] did not deprive the defendant of his right to a fair trial." (Emphasis in original; internal quotation marks omitted.) Id., 594–95, quoting *State* v. *Ceballos*, 266 Conn. 364, 414, 832 A.2d 14 (2003). Allowing for the zeal of counsel in the heat of argument, we do not find the remarks to be grossly egregious.

As in *State* v. *Williams*, supra, 204 Conn. 540, we assess the centrality of the misconduct to the critical issues in the case in conjunction with our evaluation of the strength of the state's case. The state presented evidence through Pelletier that the defendant was a

member of the Island Brothers, whose code required him, as the victim's sponsor, to avenge the killing of Corey Grear, a fellow member of the Island Brothers. Pelletier also testified as to the defendant's grief over the killing of Corey Grear, whom the defendant held in his arms after Corey Grear had been shot.

Pelletier, who policed the "Island" housing projects and had an intimate knowledge of the Island Brothers, identified the victim, the defendant, Tacuma Grear, George David Wright and Jenkins as members of the Island Brothers. There was also convincing evidence, in the form of group photographs, that the defendant, despite his testimony to the contrary, was a member of the Island Brothers.

Tacuma Grear, after being shown his *Whelan* statement, testified that he witnessed the shooting of the victim by someone who looked like the defendant. Grear testified that the defendant looked like a "cat ready to pounce" when Grear saw him standing at the rear of the Jeep before the shooting. George David Wright's previous testimony described the man he saw walking away after having fired the fatal gunshots as walking with the defendant's limp, which he knew, and dressed as was the defendant twenty minutes before the killing.

Jenkins, in his *Whelan* statement, identified the defendant as the one who had shot the victim. We note that the *Whelan* statements were obtained in separate interviews of Tacuma Grear and Jenkins. See *State* v. *Thompson*, supra, 266 Conn. 450–51. Each *Whelan* statement therefore corroborated the other statement. See id., 452. Stevenson also placed the defendant, contrary to the testimony of the defendant and other defense witnesses, at the front of the Jeep at the time of the killing.

The defendant's behavior following the shooting also substantiated the state's case. Although he was not identified by the police as the killer that night, the defendant called Tacuma Grear to ask him if his name was mentioned in the news reports of the shooting. Fearing that the police had a warrant to arrest him for the killing of the victim, the defendant testified that he went to Milford to leave the area, but decided to go to the police, who wanted to talk to him.

The defendant testified that he was wearing one of his bulletproof vests on the night of the victim's shooting, as well as at the time he had seen the victim shoot Corey Grear. A bulletproof vest had saved the defendant's life in an earlier shooting, and he was photographed wearing one. He also testified that he did not go to certain areas of the "Island" unless he had a gun or was with someone who had a gun. He testified that the victim was seeking him on the night of the shooting to be supplied with ammunition. The defendant played a role in the gun violence at the "Island."

Both affection for Corey Grear and the code of the Island Brothers were motives for the defendant to kill the victim. In this case, motive and opportunity were present to corroborate the testimony of the reluctant eyewitnesses. Although not an overwhelming case, there was strong evidence presented by the state. See id., 483. "The state's case may not have been ironclad; however, we have never stated that the state's evidence must have been overwhelming in order to support a conclusion that prosecutorial misconduct did not deprive the defendant of a fair trial." (Internal quotation marks omitted.) *State* v. *Stevenson*, supra, 269 Conn. 596, quoting *State* v. *Thompson*, supra, 483.

Accordingly, we conclude that the defendant's right to a fair trial was not violated by the comments of the assistant state's attorney.[17]

[17] The defendant also claims that there "were also burden shifting arguments" contained in the closing argument of the assistant state's attorney.

The judgment is affirmed.

In this opinion the other judges concurred.

---

Although the defendant has cited that portion of the closing argument of the assistant state's attorney that he claims contained "burden shifting arguments," he has provided no authority or analysis to support his contention that the comments were in fact improper. Without any analysis and authority to support a proposition, we will not review the claim. See *State* v. *Brown*, 256 Conn. 291, 312, 772 A.2d 1107, cert. denied, 534 U.S. 1068, 122 S. Ct. 670, 151 L. Ed. 2d 584 (2001).